A96A1785. GENERAL MOTORS CORPORATION v. CONKLE et al.
(486 SE2d 180)

BEASLEY, Judge.

As a sanction for discovery abuse the court struck General Motors' ("GM") answer and granted default judgment as to liability. The order was certified for immediate review, and we granted GM's application for interlocutory appeal.

The parents of Howell W. Conkle, Jr. and the administrator of his estate brought a wrongful death suit on September 18, 1992, against the owner and the operator of a 1987 Pontiac Grand Am. They alleged that Conkle was riding in the front passenger seat on August 3, 1991, when the car left the road and, on impact with the ground, Conkle was thrown out of an open door and was fatally injured. With leave of the court, the Conkles added the car's manufacturer GM as a defendant on June 27, 1993. They asserted liability based on negligent design, testing, and manufacture of the door latch, plus product liability, fraudulent concealment of defects and wrongful refusal to recall its products, and violation of OCGA § 10-1-393 (a), the Georgia Fair Business Practices Act.

Along with the complaint served on GM on July 28, the plaintiffs served interrogatories and requests for certain documents covering GM's design, testing and post-delivery experience with the type of door latch in 40 million vehicles over an 18-year period. The Conkles granted GM's request for an extension to respond to discovery, stipulating a response date of September 14, 1993. GM responded on that

date, stating what documents it would provide (e.g., documents relating to door openings and ejections in Pontiac Grand Ams although the request referred to "Type III door latches" in "any GM division"). GM also raised several objections, including that some requests asked for information protected by attorney-client privilege or the work-product doctrine, and stated that some documents requested would be made available in a reading room at GM's headquarters in Michigan.

Two weeks later, on September 28, the Conkles moved for an order compelling GM to fully respond to their discovery requests, specifically objecting to the use of the out-of-state reading room and asserting that even the documents GM indicated it was willing to produce were not responsive to the requests.

The next day a discovery conference was held involving the parties and the court at which the Conkles objected to what they characterized as various GM discovery tactics including delay, nonresponsive answers to requests for production of documents, and insistence on a protective order that GM would not pursue. The court focused on discovery concerning the accident itself, and the parties agreed to try to complete discovery as to that aspect of the case in 90 days, with the recognition that resolution of accident issues might be dispositive of the case.

Approximately three weeks later (October 18), GM moved for a protective order under OCGA § 9-11-26 (c) (7) to ensure confidentiality of what it regarded as trade secret information. After serving supplemental responses on November 1, GM moved the next day for a protective order precluding the Conkles from pursuing discovery concerning the door latches until it was shown the door had actually opened during the accident. This latter motion included affidavits of witnesses who stated the doors of the car were not open after the accident and could not be opened.

On November 29, a hearing was held on the Conkles' motion to compel. GM opposed it and sought the granting of its two motions for protective orders. The court did not rule until February 24, 1994, at which time it issued an order to control dissemination of documents reflecting information GM considered confidential, ruling they were to be produced in this case. "Confidential" was defined in accordance with the trade secrets provision of OCGA § 9-11-26 (c) (7), and the order specifically stated it was not a waiver of GM's right to oppose discovery on other grounds. GM's second motion for a protective order, challenging door latch involvement, was not addressed. The court also ruled on the Conkles' motion to compel discovery, requiring production of all documents the Conkles had previously requested within 20 days. Neither order addressed GM's privilege claims, but they had not been the subject of a motion for protection.

GM served written supplemental responses and 93 boxes containing approximately 300,000 pages of documents on March 15, within the 20 days, but these were not all that the court required it to produce. It did not seek an extension. On March 29, two weeks after the deadline for the court-compelled production, and nine months after the requests for discovery were served, the Conkles moved for the sanction of default and also sought a ruling that all of GM's claims of privilege be deemed waived, all supplemental responses be stricken, and all costs of production be cast upon GM.

GM continued to produce documents past the court-ordered deadline, in March and April. It did not move for another protective order, but it did continue to claim that some documents were privileged, although it submitted no supporting evidence in the way of affidavits or otherwise. GM served on the Conkles a "privilege log" indexing the allegedly privileged 1,085 documents by "Bates numbers" on March 28.

On April 11, GM supplied the Conkles with a supplemental privilege log, superseding the first. GM deposited the material reflected in its privilege log with the court for in camera review on April 15.

Two weeks later, on April 27, the Conkles' counsel wrote counsel for GM expressing dissatisfaction with its responses and urging it to respond to the March 29 motion for sanctions with, in part, a proper response to the requests to produce. GM responded to the motion for sanctions on May 2, contending it was complying with the court's order to produce and complaining that the 20-day deadline was impossible to meet, given the number of documents requested. GM asserted that the court's order did not rule on GM's claims that some documents were privileged. It attached a 63-page appendix stating its position on the various unfulfilled requests to produce.

On June 3, the Conkles replied that GM's claims of privilege were unsupported and untimely. A month went by, and on July 7, the Conkles moved that the "privilege log" documents be produced, noting that GM had supplied no evidence supporting its privilege claims. GM responded a month later, on August 8, restating the privilege claims, but still without evidence or motion for protective order.

Eleven months later, on July 12, 1995, nearly 17 months after the deadline, GM served supplemental responses and produced documents reflecting an additional 1,200 crash tests. This occurred a week after the Conkles filed a supplemental brief in support of their motion for sanctions (July 5) that made particular reference to a discovery ruling in a pending suit in Texas. In that case, which the Conkles contend involves the same type door latch as the one at issue here, a special master was appointed for in camera inspection of allegedly privileged materials, and the Conkles attached the master's report to their brief. The brief recognized distinctions between Texas

law on attorney-client privilege and the law of Georgia but suggested the report might be instructive nonetheless.

On August 11, while still holding the Conkles' motion for sanctions and GM's second motion for protective order in abeyance, the court granted the Conkles' motion to produce documents specifically claimed as privileged, stating that the special master's report in the Texas case was "carefully examined," that the court was satisfied Texas law accurately reflected Georgia law as to privilege claims, and that the court's decision was based "in large part" on the special master's report in the Texas case. The court declared that 882 of 1,085 documents submitted for in camera inspection were not privileged and that 203 were privileged. It ordered the non-privileged documents to be produced to the Conkles no later than August 23.

The day before the deadline, GM moved for reconsideration or stay of the August 11 order to produce as it pertained to 14 of the 882 documents, stating it was producing the remainder. For the first time, affidavits supporting the privilege claims were submitted. GM argued that as the court based its ruling on that of the Texas court, its ruling should be the same as to 13 documents which were common to both cases. The fourteenth document was considered privileged by the Texas court but not by the court in this case. The next day the court stayed its order as to production of the 14 documents.

As to GM's motion for reconsideration, the Conkles responded that it would be inappropriate because GM did not submit any evidence supporting the privilege claim previously. They also filed a supplemental brief in support of their original motion for sanctions, detailing what they contended was a pattern of discovery abuse by GM in this and other cases dealing with the same model door latch and claiming that 180 documents compelled by the court's February 24, 1994 order were still being withheld by GM.

GM's motion for reconsideration as to the 14 documents was denied on November 1, and its motion for a certificate of immediate review of that order was denied. GM then sought a writ of mandamus in superior court, to require the state court judge to reverse the decision as to the privilege claims. The superior court, finding no authority for such an action, denied the writ, and the Supreme Court refused review. The Conkles filed a motion for lesser sanctions on November 28, intending to supplement the original motion for the sanction of default, not supplant it. The motion requested a sanction that it be established as fact that the door at issue opened and Conkle was ejected. It also requested GM be barred from offering any evidence contrary to that fact or any evidence of alcohol consumption by any person involved in the accident.

On January 24, 1996, 22 months after the Conkles had first requested the sanction of default, while GM still held the 180 court-

compelled documents, the court granted the Conkles' original motion for sanctions, striking GM's answer to the complaint, declaring default judgment, and setting a date for the trial of damages. This is the order containing rulings which GM enumerates as error.

1. GM contends in its first two enumerations that the trial court abused its discretion in striking its answer and defaulting GM as to liability, as a sanction for discovery abuse, given the particulars of this case. Although the court did not specify the statutory basis for its order, it is clear it granted the sanction because of failure to obey the court's order to compel the production of documents, OCGA § 9-11-37 (b) (2) (C), rather than a general failure to provide discovery. See OCGA § 9-11-37 (d); *Kemp v. Rouse-Atlanta, Inc.*, 207 Ga. App. 876, 882 (429 SE2d 264) (1993).

When a party wilfully fails to comply with a court order compelling discovery, the court can impose the "drastic sanctions of dismissal and default" under OCGA § 9-11-37. *Joel v. Duet Holdings*, 181 Ga. App. 705, 707 (353 SE2d 548) (1987). It is a consequence of disobedience and is authorized " 'where the failure is wilful, in bad faith or in conscious disregard of an order.' " (Citation omitted.) Id. This is "distinguished from an accidental or involuntary non-compliance. A conscious or intentional failure to act is in fact wilful." (Citations and punctuation omitted.) *Bells Ferry Landing, Ltd. v. Wirtz*, 188 Ga. App. 344, 345 (373 SE2d 50) (1988). See also *Vining v. Kimoto USA*, 209 Ga. App. 296, 297-298 (2) (433 SE2d 342) (1993): "[W]ilfulness, bad faith, or that behavior which at best reflects a conscious indifference to the consequences of failure to comply with the trial court's order."

When the shoe is on the other foot, the standard is the same: " '(T)he dismissal of a lawsuit under Code Ann. § 81A-137 (OCGA § 9-11-37) for failure to comply with a discovery order is an extreme sanction which may only be employed for a wilful failure in bad faith or in total disregard of the court's order.' [Cit.] Such a sanction is generally warranted 'only where a clear record of delay or contumacious conduct by the plaintiff exists and a lesser sanction would not better serve the interest of justice. (Cit.)' [Cits.]" *Harwood v. Great American Mgmt. &c.*, 171 Ga. App. 488, 490 (320 SE2d 269) (1984).

The court's discretion is broad, and "[h]istorically it has been the policy of the Georgia appellate courts to refuse to interfere with a trial court's exercise of its discretion in absence of abuse" under the discovery provisions of the Civil Practice Act as well as generally. (Citations and punctuation omitted.) *Hernandez v. State of Ga.*, 200 Ga. App. 368, 369 (408 SE2d 160) (1991). But it is not unlimited, and the Court in *Harwood* reversed the dismissal of the lawsuit because "it [could not] reasonably be said that the appellants were guilty of such a wilful or flagrant disregard either of the court or of the discov-

ery process as would justify the extreme sanction of dismissal." *Harwood*, supra at 491.

Instances when the extreme sanction has been upheld are instructive. In *Hernandez*, supra, the trial court found that the defendant's answers, which were only partial, were " 'wilfully inadequate' " and " 'evasive,' " interposed "in bad faith for the purpose of wilfully evading her discovery obligations." Id. at 369-370. The court took into account defendant's conduct and her failure to seek to justify or explain her initial failure to respond and the consequent waiver of her right to interpose objections.

The default upheld in *Joel*, supra, was based on the trial court's finding that the actions of Joel and his counsel were wilful in that they showed no intention to comply with the court's order. They had refused to produce required documents which Joel or his accountant had, after the court ruled that they were discoverable and ordered them produced.

The standard for imposition of default or dismissal as a discovery sanction has been variously stated. In addition to the above articulations, *Schrembs v. Atlanta Classic Cars*, 261 Ga. 182 (402 SE2d 723) (1991), speaks of wilfulness, id. at 182, and " ' "conscious indifference to the consequences of failure to comply," ' " (citations omitted) id. at 183, as does *Didio v. Chess*, 218 Ga. App. 550, 551 (462 SE2d 450) (1995). Despite a variety of articulations, it is clear the ultimate sanction requires more than merely wilful, as opposed to negligent, behavior. There must be some indication that failure to comply shows less than the full respect that must be accorded a court order.

Despite this standard, GM contends that striking the answer is an appropriate sanction only if there is a total failure to respond to an order to compel discovery. The case it cites does not pronounce such a rule and was specifically decided under the "procedural scenario" of OCGA § 9-11-37 (d), not subsection (b) (2) (C). *Thornton v. Burson*, 151 Ga. App. 456, 461 (2) (260 SE2d 388) (1979). In subsection (d) cases, "[t]he imposition of penalties . . . is limited to an *absolute* failure to respond. [Cit.]" (Emphasis in original.) *Orkin Exterminating Co. v. McIntosh*, 215 Ga. App. 587, 589 (3) (452 SE2d 159) (1994). Failure to obey a court order need not be total in order to warrant the granting of a default. In *Joel*, for example, one of the required documents was produced, and it was explained that another did not exist. See also *Lewis v. Evans*, 212 Ga. App. 49 (441 SE2d 425) (1994) (physical precedent only).

When addressing the standard for the ultimate sanction, GM makes three basic arguments for reversal of the order striking its answer and declaring it to be in default, which establishes its liability as to all claims and relegates it to a trial on damages only. GM

contends it was entitled to a hearing on the motion for sanctions (before the court could impose the most severe sanctions); that the order did not support the sanction because there was no finding of wilfulness, or bad faith, or a conscious indifference to the consequences of failure to comply; and that the evidence of what had transpired in the discovery process did not support the imposition of the sanction selected.

(a) As to GM's contention that a hearing was necessary, "the trial court need not conduct a hearing on the issue of wilfulness in every case. Such a requirement serves no purpose where the trial court can otherwise determine wilfulness on the part of the party against whom the sanctions are sought." (Footnote omitted.) *Schrembs*, supra at 182-183. The respondent must have an opportunity to present any explanation or justification for the failure to comply. *Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 215 (480 SE2d 604) (1997). In some instances, this requirement will be fulfilled when a prior opportunity to explain noncompliance had been afforded the nonmovant.

In *Oliff v. Smith*, 214 Ga. App. 358 (447 SE2d 707) (1994), the dismissed plaintiff argued before this Court that a hearing was required. Although this Court noted one is not always necessary under *Schrembs*, it is apparent in *Oliff* that the plaintiff was afforded the opportunity to assert an explanation, but the Court rejected her excuse that she was "out-of-pocket." In *Vining*, supra, plaintiff totally failed to respond to discovery and, at the hearing on the motion for sanctions, failed "to 'give any acceptable justification for its failure to make discovery or respond to (Kimoto's) discovery requests.' " Id. at 296. At that hearing, the court put plaintiff on notice that failure to make discovery by a date certain would result in dismissal upon an affidavit from defendant's counsel. In those circumstances, no second hearing was needed for the court to find wilfulness.

Nor was a hearing required in *Johnson v. Lomas Mtg. USA*, 201 Ga. App. 562 (411 SE2d 731) (1991). The defendant served plaintiff with simple discovery requests primarily concerned with his personal experience with the property at issue and his status as guardian. He answered with documents which were nonresponsive, as the court decided upon defendant's motion to compel. The court ordered response by a date certain, but plaintiff made no further response other than to contend he had no other documents. Under those circumstances, no further hearing was necessary for the imposition of the sanction of dismissal. In *Hernandez*, supra, after hearing on a motion to compel, the trial court's examination and rejection of defendant's stated objections to ordered discovery prior to imposing the sanction of default was sufficient to satisfy the requirement that the court "make a determination, following notice and an opportunity for hearing, that the failure to comply with the order was wilful.

[Cit.]" Id. at 370.

In this case a variety of circumstances required a hearing. The court held the motion for sanctions in abeyance, thereby implicitly allowing a longer period to comply with its order. This forbearance was reinforced by holding the Conkles' supplemental brief in support of their motion for sanctions for four months before the court ever acted upon the motion for sanctions.

During the 22 months between the filing of the motion and the order granting sanctions, the court tolerated a degree of noncompliance by reviewing documents held back by GM to ascertain whether they were privileged, despite no proper motion for protective order as to those 1,085 documents. The court ruled some to be privileged and nondiscoverable, a position inconsistent with insistence on strict compliance with its order to compel. That the court did so without comment was an indication of forbearance and willingness to assist in the achievement of full production of proper documents.

Nor is the situation here as simple as those in which a hearing has not been necessary. In *Schrembs*, supra, plaintiff failed to answer the single simple interrogatory which was compelled by the court and had no justification for it. She had already been heard on why she did not answer, at the hearing on the motion to compel. Further hearing would be superfluous. Similarly, in *Oliff*, supra, *Vining*, supra, *Johnson*, supra, and *Hernandez*, supra, there was in each case a simple, focused dispute, a relatively quick resolution, and nothing to be gained by further hearing.

Unlike those cases, there was here no warning that sanctions were imminent. Nothing had focused the court's and the parties' attention on the matter. The motion for sanctions had been filed 22 months before. GM had continued to provide discovery, which the Conkles accepted. Even without full compliance, GM's production was voluminous. Approximately two months before the court's order, the Conkles did file a motion for lesser sanctions, but they did not attempt to force resolution of their original motion for sanctions by rule nisi or other means.

The fact that production continued after the Conkles' motion for sanctions, and all the circumstances around that serial production, meant that the discovery picture had changed considerably between the time the motion was made and it was ruled upon. It was no longer as it had been when the documents supporting the motion were filed. A hearing on the motion before the court granted it would have allowed the parties to argue how those changed circumstances should be considered.

A hearing would also have afforded the opportunity for the court to specifically consider a variety of factors before making its determination, and a record upon which this Court could ensure that rele-

vant factors had been considered. Without suggesting a rigid test, relevant factors that a court should consider in determining whether to impose the ultimate sanction of default or dismissal are: (1) the size, volume, and amount of discovery requested; (2) the amount of time allowed for production; (3) the amount of delay between request and production; (4) the amount of delay between the court's order and production; (5) the degree of reasonableness of the excuse for noncompliance; (6) the prejudice to movant's case; (7) the degree of departure from our constitutional and statutory mandate for the just, speedy, efficient, and inexpensive resolution of disputes (Ga. Const. of 1983, Art. VI, Sec. IX, Par. I; OCGA § 9-11-1); (8) the relative amount of compliance or noncompliance with the court's order; (9) the efforts made to comply or move for an extension; (10) the imposition placed on court resources by the failure to comply; (11) whether prior warning was given to the offending party of the effect of noncompliance; and (12) the efficacy of alternative sanctions against the party or counsel. See Wright, Miller & Marcus, Fed. Practice & Procedure, Civil 2d, pp. 625-627, § 2284 (1994 ed.); *Hathcock v. Navistar Intl. Transp. Corp.*, 53 F3d 36, 40-41 (4th Cir. 1995); *Ehrenhaus v. Reynolds*, 965 F2d 916, 920-921 (10th Cir. 1992).

These factors reflect the three basic considerations involved in a case involving a discovery sanction such as this: the defendant's right to have its day in court to contest liability; the plaintiff's right to discovery without harassment, undue delay, or undue cost; and the necessity of obedience to the court's orders.

Punishment should not be imposed on a party to a civil case for conduct which is ancillary to the merits of the case and which occurs during the life of the case without a consideration of the nonmovant's defense of its conduct. The exception is when the record shows there is no justification or mitigation. In addition to allowing an explanation to be given, a hearing can help hone an appropriate sanction.

Considering all the circumstances, due process required a hearing in this case, even more so because the ultimate sanction was imposed.

(b) We cannot, however, simply reverse on this basis as GM raises another issue which is capable of repetition in this case.

With respect to a finding of wilfulness, or bad faith, or a conscious indifference to the consequences of failure to comply, the court must make an *express* finding as a precondition to sanctions. *Schrembs*, supra. "[T]he trial court must find wilfulness as a predicate to imposing the sanctions" of dismissal and default under OCGA § 9-11-37 (b) (2), which are recognized as the most harsh. Id. at 182. "It remains the rule that a *prior finding* of wilfulness, bad faith, or that behavior which at best reflects a conscious indifference to the consequences of failure to comply with the trial court's order compel-

ling discovery is a prerequisite to the imposition of the harsher sanctions authorized by OCGA § 9-11-37 (b) (2). [Cits.]" (Emphasis in original.) *Vining*, supra at 297-298 (2). See also *Loftin*, supra at 215.

The court's order does not contain any finding that would support this ultimate sanction. The order states: "The Plaintiffs have moved for sanctions against GM for failure [to] obey a court order regarding the production of documents. This issue has been pending for over one year. This court has been remiss in not timely ruling thereon. It is evident from the record in this case that GM has abused the discovery process. It is true that the scope and volume of the discovery requested are immense. GM's assertion of substantial compliance, misunderstanding and other explanations are inadequate in light of the magnitude of legal expertise and other resources it has applied to the discovery process in this case. In this context the court must determine what sanction or sanctions are appropriate.

"The application of a fine or taxing of other costs is not an adequate remedy for this situation. This court has no viable alternative save the entry of a default judgment against GM on the issue of liability. It is therefore ordered that the Answer of GM in this case is stricken and that GM is in default upon the issue of liability in this case."

We cannot merely infer that the court considered GM's actions concerning compliance with its order to be wilfully disobedient or in bad faith or consciously indifferent to the order. *Schrembs*, supra at 182, requires a prior finding of such. There must be no doubt that the court found as fact the prerequisite conduct and that it is demonstrated in the record before the court can impose liability on a party on the underlying dispute because of a discovery failure. The parties and the appellate courts should not be left to infer such a pivotal finding or the basis for it, particularly taking into account the high stakes which depend on it and the simplicity of articulating it.

The Conkles argue that the record would support a finding of wilfulness, or bad faith, or a conscious indifference to the consequences of failure to comply, pointing to a variety of instances they claim show such. Regardless, there has been no finding of the required fact. Not only does none appear in the court's order granting the sanction, there is no prior order containing any such finding. Compare *Vining*, supra. As such is a prerequisite to the imposition of the default sanction, the court erred in imposing that sanction.

(c) Additionally, there is the question whether the record *could* support a finding of wilfulness, or bad faith, or a conscious indifference to the consequences of failure to comply, so that depriving GM of its day in court as to fault did not constitute an abuse of discretion. GM, as appellant, must persuade that the record was such that the court did abuse its discretion. "As a general rule, the trial court

should attempt to compel compliance with its orders through the imposition of lesser sanctions than dismissal [or default]. The drastic sanctions of dismissal and default cannot be invoked under OCGA § 9-11-37 except in the most flagrant cases. . . . *Hernandez*, supra at 369." (Punctuation omitted.) *Loftin*, supra at 214 (3); *Joel*, supra at 707. As governed in this manner, and by a consideration of the relevant factors before the trial court, we conclude that the sanctions were too harsh.

First we compare the circumstances of this case with those of others of recent vintage in Georgia's appellate courts in our effort to be uniform and treat like cases alike. Recent cases are the most relevant because they are decided in the context of today's escalated discovery industry. Problems in the past, both prior to the Civil Practice Act and in the early years since its advent, were not magnified by the sophisticated strategies and powerful technologies of today's information and communications age. A review of recent Georgia cases which uphold the default or dismissal sanction show that GM's conduct was not of the same severity or extent. See *Revels v. Wimberly*, 223 Ga. App. 407 (477 SE2d 672) (1996); *Didio*, supra; *Lewis v. Evans*, 212 Ga. App. 49 (441 SE2d 425) (1994) (physical precedent only); *Vining*, supra; *Sellers v. Nodvin*, 207 Ga. App. 742 (429 SE2d 138) (1993); *Johnson*, supra; *Huff v. E. L. Davis Contracting Co.*, 195 Ga. App. 691 (394 SE2d 615) (1990); *Roderiquez v. Saylor*, 190 Ga. App. 742 (380 SE2d 339) (1989); *Peoples v. Yu*, 184 Ga. App. 252 (361 SE2d 244) (1987); *Carey Canada, Inc. v. Hinely*, 181 Ga. App. 364 (352 SE2d 398) (1986), rev'd on other grounds, 257 Ga. 150 (356 SE2d 202) (1987).

The record in this case shows as follows:

(1) The size and breadth of discovery was great. Sanctions are usually applied when the failure to properly participate in discovery concerns a more focused issue than incomplete or inadequate responses over a range of requests. Such a breadth and volume makes a finding of wilful noncompliance more difficult.

(2) The time allowed for production of documents was 20 days. Despite the volume involved, GM produced approximately 300,000 pages of documents in that time.

(3) GM responded timely to the request to produce, indicating that the voluminous request would be met. While production took longer, it was ongoing.

(4) GM's response to the court's order was timely. While not all documents were produced in 20 days, a significant portion of those requested were.

(5) Given the volume of documents requested, GM's explanation for late production was marginally reasonable.

(6) The only prejudice to the merits of the Conkles' case is an

impact on the resources they have available to pursue it, not on their ability to present the facts.

(7) GM's failure to fully and timely respond to the requests to produce has delayed the resolution of this case.

(8) In terms of documents produced, GM has largely complied with the order substantively, retaining only a handful of documents (see Division 2). Nevertheless, the vigor of the fight over them hints at their importance.

(9) While GM has obviously made considerable effort to produce documents, it did not request any extension, leaving a deadline it considered impossible.

(10) The failure to comply, and the efforts made to force compliance, have resulted in a significant imposition on the resources of the court below and this Court.

(11) There was no prior warning that failure to fully comply would result in default. None was given in the months or weeks immediately prior to the imposition of the sanction, and the order compelling discovery did not warn that the ultimate sanction would be imposed on failure to fully comply within 20 days.

(12) No lesser sanction was first employed. Although the court recited in its order that alternative sanctions would not be sufficient, without a hearing it is a premature conclusion.

Unlike the plaintiff in *Vining*, supra, the Conkles have not been prejudiced in their ability to assert the merits of their suit. They have received voluminous discovery responding to their requests. That the nature of the responses may necessitate expenses to separate germane information from the nongermane does not suggest a sanction of default but rather one reflective of the costs and punishment to deter such activity further.

In no prior case we have examined has a respondent been able to show the degree of production of documents in an effort to comply such as GM does. By the time sanctions were imposed, GM had responded with approximately 500,000 pages of documents and the court had ruled on claims of privilege. Although GM's responses were partial and incomplete, they are not partial and evasive in the sense that they were a simple denial of the existence of any documents that answered the requests. Compare *Lewis*, supra.

The record does not support a finding of that degree of wilfulness and contumacious conduct which would warrant depriving GM of its day in court and contradict the spirit of the Civil Practice Act favoring resolution of cases on their merits. *Ambler v. Archer*, 230 Ga. 281, 288 (1) (196 SE2d 858) (1973); *Jordan v. Santa Fe Engineering*, 198 Ga. App. 600, 602 (1) (402 SE2d 304) (1991). The trial court was obliged to take into account the entire period from the time the discovery requests were served in July 1993, and the time of the court's

imposition of dismissal and default. *Swindell v. Swindell,* 233 Ga. 854, 857 (3) (213 SE2d 697) (1975); *Didio,* supra. In that period the defendant produced hundreds of thousands of pages of documents, although it has still not produced 180 documents.

Balancing the policies of preventing discovery delays and deciding cases on the merits, default was too severe a sanction. When the plaintiffs moved for default judgment, they had just received over 300,000 pages of requested documents two weeks before. They have not contended they had reviewed them and were hampered in their case preparation by not having the remainder during that period. Given the delays and the failure to fully comply, the record clearly would support the imposition of lesser sanctions. In order for the court to determine what is appropriate within the wide range of possibilities, a hearing must be had.

We do not condone GM's failure to meet its discovery obligations, but we conclude that the sanction chosen by the court was too severe for the facts presented. The case is remanded for a hearing on appropriate sanctions which adequately compensate the Conkles for delays and costs, punish GM so as to deter any future noncompliant conduct, and generally assures respect for the court's orders. See *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U. S. 694, 707-709 (102 SC 2099, 72 LE2d 492) (1982); *Nat. Hockey League v. Metropolitan Hockey Club,* 427 U. S. 639, 643 (49 LE2d 747, 96 SC 2778) (1976).

2. GM also disputes the court's rulings as to the 14 documents which were the subject of the November 1, 1995 order denying reconsideration of GM's privilege claims. It contends the court incorrectly analyzed the privilege claims by accepting Texas law and the special master's report from litigation pending there, instead of applying Georgia law, arguing that under Georgia law the attorney-client privilege or the work-product doctrine applies to each document. See OCGA §§ 9-11-26 (b) (3); 24-9-21 (2); 24-9-24; 24-9-25; and 24-9-27 (c).

We need not address the substantive issues because of a problem of timing. "The burden is upon the [party contesting production] to establish that counsel's advice was privileged legal advice and thus not subject to discovery. [Cits.]" *Southern Guaranty Ins. Co. &c. v. Ash,* 192 Ga. App. 24, 29 (383 SE2d 579) (1989). As to the work-product doctrine, the party wishing to claim the protection of OCGA § 9-11-26 (b) (3) has the burden of showing the document or other item was prepared in anticipation of litigation. *Dept. of Transp. v. Hardaway Co.,* 216 Ga. App. 262, 265 (2) (454 SE2d 167) (1995).

GM argues the affidavits it submitted with its motion for reconsideration of the privilege ruling as to these 14 documents met its burden of establishing its privilege claims. The Conkles argue that

GM's failure to submit evidence in support of the privilege claims until the motion for reconsideration waived any claims of privilege. The matter is not actually one of waiver but of timeliness and appellate consideration of the court's action.

In its brief in opposition to the Conkles' motion to produce the documents submitted for in camera review, GM argued that its obligation to support its privilege claims had "not matured" and would not mature until the court had concluded its in camera review. This is incorrect. An unsupported claim of privilege does not meet the proponent's burden of showing the privilege applies. The procedure followed by GM — claiming that a privilege applies even when the court has entered an order compelling discovery but submitting evidence supporting the claim only after the court has ruled privilege does not apply as to specific documents — is not a proper assertion of the privilege. Although there had been previous motions to compel, GM's obligation to support its privilege claim with evidence under Uniform Superior Court Rule 6.2 "matured" at least when the Conkles moved on July 7, 1994, for the production of the specific documents GM believed were privileged and had already submitted to the court. Although the Conkles had previously moved to compel production of all documents they requested, GM did not respond to any earlier motion with evidence showing the claimed privileges.

GM contends it asserted its privilege claims in its first response to the Conkles' requests to produce on September 14, 1993, and again when it submitted a privilege log to the Conkles and submitted the documents to the court. Stating a privilege claim and meeting the burden of showing by evidence that privilege applies are not the same. GM did not submit any evidence to support its privilege claim until its motion for reconsideration,[1] despite the fact that the Conkles' July 7, 1994 motion prominently noted GM's failure to support its claims. Any early statement by GM that privilege existed does not cure GM's late filing of the affidavits.

It was not an abuse of the court's discretion to deny the privilege claims as to these 14 documents when GM did not supply evidentiary support for the claims until the motion for reconsideration, over one year after the need arose. *Citadel Corp. v. Sun Chemical Corp.*, 212 Ga. App. 875, 877-878 (3) (443 SE2d 489) (1994).

*Judgment affirmed in part, reversed in part and case remanded. Birdsong, P. J., concurs. Blackburn, J., concurs specially.*

---

[1] GM contends the court's February 24, 1994 order to compel did not rule on the privilege claims, leaving it free to assert those claims, but the order shows no exception for allegedly privileged documents. It does not appear that GM made any formal motion for a protective order on the basis of privilege, only the motions based on trade secrets and the inapplicability of door latch issues.

BLACKBURN, Judge, concurring specially.

Under the particular facts of this case a hearing was required before the imposition of the extreme sanction of default, there being no definitive sanction order outlining the basis for the court's action. I therefore agree with the majority that such sanction must be reversed and this case remanded for a hearing. However, I believe it is possible that the evidence in the record could authorize the trial court, following a proper hearing, to determine that GM's conduct was wilful and that default sanctions are appropriate. To the extent that the majority suggests otherwise, I must respectfully disagree. I concur fully in Division 2, upholding the trial court's ruling that the 14 documents at issue are not subject to a claim of privilege.

"[A] very broad discretion is granted judges in applying sanctions against disobedient parties in order to assure compliance with the orders of the courts. By OCGA § 9-11-37 (b) (2) (C), the courts are specifically granted the discretion to dismiss complaints or render default judgments against disobedient parties. This applies to the disobeying of an order to produce. Historically, it has been the policy of the Georgia appellate courts to refuse to interfere with a trial court's exercise of its discretion in absence of abuse. This policy is applicable to a trial judge's exercise of the broad discretionary powers authorized under the discovery provisions of the Civil Practice Act." (Citations and punctuation omitted.) *Hernandez v. State of Ga.*, 200 Ga. App. 368, 369 (408 SE2d 160) (1991).

Trial judges, through their direct involvement with the case, the parties, and the attorneys, and their familiarity with the actions of the parties in the conduct of discovery in similar cases that are properly brought to their attention, are in the best position to evaluate the parties' conduct and to determine the appropriate level of sanctions.

This Court is not authorized to substitute its judgment for that of the trial court and may interfere with such exercise only where the trial court has abused its discretion in controlling the conduct of discovery or the enforcement of its orders. "The standard for review of an order dismissing a[n] [answer] for [defendant's] failure to respond to discovery is abuse of discretion." *Fisher v. Bd. of Commrs. &c.*, 200 Ga. App. 353, 354 (2) (c) (408 SE2d 120) (1991). The issue here is, did the trial court abuse its discretion in striking defendant's answer as a discovery sanction under the facts of this case?

In its order sanctioning GM, the trial court did not make express findings of fact regarding GM's wilfulness, and did not discuss what facts it relied upon in imposing its sanctions. We do not know, therefore, on what facts the trial court relied in sanctioning GM. The requirement that wilfulness be shown before the imposition of the drastic sanction of dismissal and default is well established. See *Joel*

*v. Duet Holdings*, 181 Ga. App. 705, 707 (353 SE2d 548) (1987). Here, however, a finding of wilfulness by the trial court is implicit in its order. "[T]his court will not presume the trial court committed error where that fact does not affirmatively appear. The judge is presumed to know the law, not the opposite." *Whiteley v. State*, 188 Ga. App. 129, 130-131 (1) (372 SE2d 296) (1988). See *Windom v. State*, 187 Ga. App. 18 (369 SE2d 311) (1988) ("implicit in any ruling by a trial court is that [the judge] has made the necessary finding of admissibility before admitting such evidence"). Id. at 19 (2). While the trial court should include a specific finding of wilfulness in its sanction, its failure to do so does not necessarily require reversal.

Generally, the trial court should hold a hearing upon a motion to impose default sanctions for discovery abuses, thereby giving the parties the opportunity to be heard and to present evidence concerning such motion. Such hearing provides an opportunity to create a record of the evidence considered by the trial court. The trial court can thereafter issue its ruling with appropriate findings. *Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 215 (480 SE2d 604) (1997) (vacating sanctions because appellant was not allowed a meaningful opportunity to explain his actions at a hearing).

We have, however, recognized that this general rule is subject to exceptions. The requirement of a hearing "serves no purpose where the trial court can otherwise determine wilfulness on the part of the party against whom the sanctions are sought." (Footnote omitted.) *Schrembs v. Atlanta Classic Cars*, 261 Ga. 182, 183 (402 SE2d 723) (1991). Under such circumstance, the trial court has the option of determining wilfulness and sanctioning a party without a hearing. See *Oliff v. Smith*, 214 Ga. App. 358 (447 SE2d 707) (1994); *Johnson v. Lomas Mtg. USA*, 201 Ga. App. 562 (411 SE2d 731) (1991).

However, where the trial court makes a determination of wilfulness and sanctions a party without conducting a hearing, it is essential that the order imposing sanctions outline the basis for the court's action, as there is otherwise no way of determining whether or not the trial court abused its discretion in so ruling.

Here, the trial court has not included in its order the facts upon which it relies. Absent such information in the sanction order or a transcript of a hearing on the motion, this Court is unable to apply the applicable standard of review in this matter. The credibility and weighing of evidence are matters which are peculiarly within the province of the factfinder, the trial judge in this matter. On appeal, the appellate tribunal does not determine the credibility or preponderance of evidence. See *Guye v. Home Indem. Co.*, 241 Ga. 213, 215 (244 SE2d 864) (1978). "The finder of fact, in this case the [state] court judge, is the final arbiter of the weight of the evidence and the credibility of witnesses. The judge's findings of fact will not be dis-

turbed on appeal as long as there is any evidence to support those findings." *Hughes v. Cobb County*, 264 Ga. 128, 130 (1) (441 SE2d 406) (1994). "[T]he [trial] court hears the evidence and is the finder of fact. An *appellate court does not find the facts, but reviews the facts found by others*." (Emphasis supplied.) *Ga. Public Svc. Comm. v. Southern Bell*, 254 Ga. 244, 247 (327 SE2d 726) (1985). The question is, does an appellate court have the authority to *make* a finding of fact, where the finder of fact has failed to do so? The answer is clearly no under the above authority. The appellate court cannot *make* a finding of fact for the same reason that it cannot *substitute* its judgment thereon for that of the trial judge; that being, that such right is reserved to the trial judge.

The majority engages in the making of findings of fact here, as the trial court did not do so, and the holding of the majority necessarily rests upon a factual finding as to the evidence in the case. If it did not do so, the majority could not have concluded that the evidence authorized the imposition of sanctions by the trial court, but not those imposed.

Unlike the majority, I would not limit the authority of the trial court to act upon this matter on remand.

DECIDED MARCH 14, 1997 —
RECONSIDERATION DENIED APRIL 4, 1997 — ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ Before Judge Prather.
*King & Spalding, Griffin B. Bell, Chilton D. Varner, Robert D. Hays, Jr., Sara E. Barton, Barnes, Browning, Tanksley & Casurella, Roy E. Barnes*, for appellant.
*Butler, Wooten, Overby, Pearson, Fryhofer & Daughtery, James E. Butler, Jr., Albert M. Pearson III, Peter J. Daughtery, Hatcher, Stubbs, Land, Hollis & Rothschild, James E. Humes II*, for appellees.
*Nelson, Mullins, Riley & Scarborough, Richard B. North, Jr., Cook, Noell, Tolley & Wiggins, J. Vincent Cook, Flournoy & Gentry, Matthew C. Flournoy, Franklin, Taulbee, Rushing, Bunce & Brogdon, W. M. Brogdon, Jr.*, amici curiae.