A98A2218. EDWARDS et al. v. DEPARTMENT OF CHILDREN & YOUTH SERVICES.
(512 SE2d 339)

ANDREWS, Judge.

Regina Edwards and Samuel James, parents of Latasha Edwards, appeal from the trial court's grant of summary judgment to the Department of Children & Youth Services (the Department) on their claim under the Georgia Tort Claims Act (the Act) for the wrongful death of their daughter.[1] In granting summary judgment, the trial court determined that the acts of the employees of the Macon Youth Development Center (YDC) came under the "discretionary acts" exception to the Georgia Tort Claims Act's waiver of sovereign immunity. We agree and affirm.

This case arose after Edwards, who was 15 at the time, died from a subdural hematoma while an inmate at the YDC. Her parents claimed the workers and nurses at the YDC were negligent in failing to provide reasonable medical care for Edwards while she was in their custody. The Department moved for summary judgment, contending that each decision made by the staff members and nurses was discretionary in nature and therefore the claim was barred by sovereign immunity. The trial court granted the motion for summary judgment and this appeal followed.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. . . ." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Accordingly, viewed in the light most favorable to appellants, the

---

[1] Appellants also brought claims under 42 USC § 1983 against several individual employees of the YDC. Appellants dismissed these claims prior to the hearing on the motion for summary judgment.

record shows that Edwards entered the Macon YDC in May 1995, and stayed there until her death on December 23, 1995. The doctor who performed the autopsy on Edwards said the subdural hematoma had not been present in her brain for more than 48 to 72 hours. However, on her health history sheet dated May 4, 1995, Edwards checked that she had frequent headaches and dizziness. Her medical records for the eight months are extensive showing, among others, complaints about chest pains, a racing heart, panic attacks, headaches, leg pain, arm pain, swollen fingers, foot pain, sleeplessness, stomach pains, and sore toes. Edwards's roommate testified that Edwards "complained every day." She said Edwards first complained about her feet swelling and that she had to walk slowly. Then she complained about her ankles, her legs, her stomach, her chest. Another resident at the YDC said Edwards "always hurt somewhere."

Nurse Murphy testified at the inquest and said Edwards had been to the clinic on the 22nd, the day before she died, complaining about a headache. Murphy examined her and saw that her nasal passages were red and swollen and gave her something for sinus problems. Murphy said Edwards came back later that day to help out at the clinic and did not complain about her head hurting anymore that day. Nurse Jenkins testified that she spent the afternoon of the 22nd with Edwards in the clinic, and Edwards never complained about a headache. She said Edwards helped her wrap gifts for the other students.

Richard Smith, the house parent on duty the morning of the 23rd, said Edwards came to him about 11:00 or 11:30 that morning and told him her head hurt. He gave her Tylenol. Around 4:00, just before Smith left, she came to him again and said her head hurt really bad, her sinuses were bothering her, and her eyes were burning. He gave her Tylenol and Sudafed.

Antonio Hodges, the house parent who came on duty after Smith left, testified that Edwards was usually complaining about some type of ache. He said that on the day of the 23rd, Edwards was complaining more than usual and they called the nurse around 5:00. They also talked about taking Edwards to the detention unit around 5:00 so she could be monitored more closely. Edwards refused to go, saying she was too weak. After returning from supper, another resident helped Edwards walk to the bathroom. The resident said Edwards kept saying, "Help me; help me."

The security guard who came to check on Edwards at 5:50 that evening stated that she could not stand on her own. She kept sliding back to the floor when lifted to her feet. The security officer said he did not know whether she did not have the strength to stand on her own or whether she was "faking it."

Nurse Williams testified at the inquest and said she received a call from Cottage D around 5:00 that afternoon, saying that Edwards was having headache pain. She suggested Tylenol and when told that Edwards had already been given Tylenol and it did not help, said she would call Nurse Brown. Williams called Nurse Brown and left a message. Ms. Murphy, the nurse on call, responded to the message and said she would call the cottage and talk to one of the workers, find out more information, and call back. Nurse Murphy called back and told Williams to take some Sudafed and Tylenol with her for Edwards when she went to the cottage that night because she had noticed some sinus problems the day before.

Williams left the clinic to make her rounds to dispense medication around 7:30 to 7:45. When she got to Cottage D, Edwards was lying on her bed. Williams asked her what was wrong and she said her head was hurting. Edwards showed Williams where the pain was and Williams rubbed her head and checked her eyes. Then Williams asked her to squeeze her hands and Edwards did, asking her why she wanted her to do that. Williams then ran her finger or pen across the bottom of Edwards's feet and she responded.

After Williams left Cottage D, one of the workers said Edwards would not take her medication, so she went back to the cottage. At that point, Edwards got up and took her medicine and then lay back down. Williams said Edwards was a little wobbly when she got up, but no more than was normal after someone had been sleeping. Around 8:20 Nurse Brown called Williams to check on Edwards and Williams told her she had checked Edwards and her vital signs were okay and Edwards was sleeping.

Hodges testified that after they allowed Edwards to go back to her room, they checked on her every five to ten minutes. Edwards responded each time they spoke to her. Kerry Flanders, one of the other residents, also testified that both Mr. Hodges and Ms. Johnson were checking on Edwards every five minutes. Hodges said he thought they might have to take her to the Medical Center but she was still "okay" at that point.

A short while after Nurse Williams left, Flanders saw Edwards lying on her bed, apparently not breathing. She ran down the hall and told Ms. Johnson. After Kerry Flanders told Ms. Johnson that Edwards looked strange, Johnson went back to Edwards's room and then called for Hodges. Hodges called security and told them to call the nurse. Security arrived almost immediately and Hodges started rescue breathing. When Nurse Williams arrived she checked Edwards's vital signs again, told one of the house parents to call 911 and started CPR.

After reviewing the evidence, the trial court concluded that the claims were barred under the Georgia Tort Claims Act because the

decisions involved in treating Edwards were discretionary, not ministerial. This appeal followed.

On appeal, the parents argue that the trial court erred in finding the actions of the YDC employees were discretionary. They contend the actions were ministerial because the Department had an absolute, nondiscretionary duty to provide or obtain medical care for Edwards and should have called 911 much sooner.[2] They claim the violation of this duty was a direct violation of the Department's policy and procedure.

Under the Georgia Tort Claims Act, the State waives its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties. OCGA § 50-21-23. However, the Act creates an exception to this waiver for the discretionary acts of state employees, even when the discretion involved is abused. OCGA § 50-21-24 (2). OCGA § 50-21-22 (2) defines "discretionary function or duty" as follows: "a function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors."

It is not disputed that the Department had a duty to provide Edwards with medical care and treatment. OCGA § 49-4A-7 (b) (5). But, what medical care to provide is discretionary and therefore is subject to immunity. *Cantrell v. Thurman*, 231 Ga. App. 510, 514 (499 SE2d 416) (1998).

In *Cantrell*, this Court held that, as a government employee, the defendant physician would have immunity for medical malpractice claims and his acts in diagnosing and treating the inmate would have been discretionary. Id. at 515. But, since the doctor was working as an independent contractor, he was not a government employee under the Georgia Tort Claims Act and, therefore, was not entitled to immunity under the Act. Id. Likewise, in *Keenan v. Plouffe*, 267 Ga. 791 (482 SE2d 253) (1997), the court stated "the decisive question in this case is whether Dr. Plouffe was acting within the scope of his official state duties while treating Ms. Keenan. If he was, then he is protected from suit by OCGA § 50-21-25." Id. at 793. The court concluded that since Ms. Keenan was a private-pay patient, the case related strictly to the medical care of Ms. Keenan and did not "call into play what might be termed 'governmental considerations,' such

---

[2] The delay in calling 911 after they found Edwards unconscious appears to have been approximately ten minutes. The security officer's notes show that at 9:00 security was called to Cottage D and at 9:10 the ambulance was called. The parents failed to show any proximate cause as to this last delay, however, because the doctor who conducted the autopsy stated that once a patient with a subdural hematoma passes out "they're not going to respond." In addition, the paramedic who first responded to the 911 call testified that Edwards was dead when they arrived.

as the allocation of state resources for various types of medical care." Id.

Similarly, in *Northwest Ga. Regional Hosp. v. Wilkins*, 220 Ga. App. 534 (469 SE2d 786) (1996), the plaintiff brought a claim for wrongful death and medical malpractice against the hospital for discharging the decedent, who suffered from an organic mental disorder, epilepsy, cardiovascular disease, thyroid problems and numerous other ailments. This Court concluded that the determination to discharge the patient to a personal care home required the health care provider to weigh "possibly competing economic and social policy considerations." Id. at 537. See also *Christensen v. State of Ga.*, 219 Ga. App. 10, 13 (464 SE2d 14) (1995) (even assuming hospital denied treatment, hospital employees' decision whether to admit or discharge a patient is a discretionary act); *Schmidt v. Adams*, 211 Ga. App. 156 (438 SE2d 659) (1993) (although not decided under the Georgia Tort Claims Act, we held that the failure of a nurse and physician's assistant at a county jail to diagnose a fatal pulmonary emboli and provide treatment were discretionary).

Here, employees were expected to call 911 in the event of a medical emergency but, if able to do so, they were to call security and the nurse first. Hodges, one of the two house parents on duty the night of the 23rd, stated in his affidavit that Edwards was prone to complain about aches in different parts of her body and exaggerate the severity of her problems to get attention. He also stated that the other inmates at the YDC lavished attention on each other when one of them did not feel well. Hodges, Johnson and Williams all submitted affidavits in which they stated they were concerned about Edwards, checked on her and monitored her closely but, in light of her past behavior when she did not feel well, they never believed they were faced with a medical emergency or that Edwards was seriously ill.

Therefore, the record shows that the YDC was under a duty to provide medical care to the children in their custody and they did provide that care. There were nurses on duty at all times and the staff called and consulted the nurses, monitored her condition and provided care and support. The type of care and support and what and how much medical treatment to provide are decisions that must be left to the discretion of the employees who work with the inmates. See *Keenan*, supra at 793; *Cantrell*, supra at 514; *Wilkins*, supra at 537. Even if it could be said that in this case the workers of the YDC abused that discretion in not calling a doctor or 911 sooner, sovereign immunity is not waived under the Act. OCGA § 50-21-24 (2).

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 12, 1999 —
RECONSIDERATION DENIED MARCH 1, 1999 — 

*Watkins, Lourie & Roll, Joseph W. Watkins, Lance D. Lourie, Langdale, Vallotton, Linahan, Threlkeld & Wetherington, William P. Langdale, Jr., William P. Langdale III*, for appellants.

*Thurbert E. Baker, Attorney General, Patricia Guilday, Assistant Attorney General, Capers, Dunbar, Sanders & Bruckner, Paul H. Dunbar III, Ziva P. Bruckner*, for appellee.