42224. CITY OF ROSWELL et al. v. DAVIS.
(335 SE2d 582)

HILL, Chief Justice.

This is a civil rights case, involving the alleged inadequate training of a police officer, here on certiorari. *Davis v. Ramey*, 174 Ga. App. 417 (330 SE2d 130) (1985). On the morning of May 24, 1980, James Roy Davis was transporting his critically ill wife to the hospital when he was stopped by Roswell police officer Michael Douglas Ramey. Davis subsequently sued officer Ramey, the City of Roswell, and its chief of police, T. L. Joyner, alleging, inter alia, that his civil rights, protected by 42 USC § 1983, had been violated.

At the time of the incident, Ramey had been on the Roswell police force for three months. Prior to joining the force, he had taken 60 hours of basic first aid at Lanier Tech in 1975, which was updated

---

when he was in the Army in 1979. He had also been a deputy sheriff with the Forsyth County Sheriff's Department for four months in 1978. His training for the Roswell police force had consisted of riding with a senior officer for three weeks. He testified that his training for handling an emergency consisted of being told "to stay calm, to use my best judgment and immediately request a supervisor who had the training and the knowledge to handle the situation." While he did not mention having been instructed how to call the rescue squad or an ambulance, he apparently had been taught how to do so since in fact he did call both. Testimony by the supervisor who was called to the scene and by the chief of police established that at the time of the incident, the city trained its police by having them ride with a senior officer until he made a written recommendation that they could go on patrol alone, and by sending them to the police academy as soon as possible — i.e., whenever a new class started — and within twelve months of their employment. See OCGA § 35-8-9 (a).

At the trial, Davis testified that when he was stopped he was driving safely and had not violated any traffic laws. When asked if he was having any trouble keeping his car under control he responded in the negative and then added: "Except when I hit that rough place down there where I met him. The station wagons, anybody that ever drove one will know that when you hit a rough place they will sway with you." Ramey testified that he initially stopped Davis because as the two cars passed each other, going in opposite directions, Davis crossed the centerline and he had to drive the patrol car onto the shoulder of the road. Having stopped Davis, Ramey asked to see Davis' driver's license and then asked what the problem was. Davis responded that his wife was sick and Ramey observed that she was lying stomach down on the back seat. She was very pale, and he was unable to feel a pulse in her carotid artery. He testified that he used a radio he had in his pocket to summon a rescue vehicle, an ambulance, and a supervisor. According to Davis, Ramey went back to his car to radio for assistance.

Davis contends that he asked to be allowed to go on to the hospital and asked Ramey to lead him there, and Ramey told him he could not leave the scene. Although Ramey testified that he never told Davis he could not leave, and that he told Davis that he was not capable of driving to the hospital and that help was on the way, we accept Davis' testimony that he was told he could not leave. Ramey further testified that he chose not to transport Mrs. Davis to the hospital in his own car because he did not want to move her and because he did not have any medical emergency equipment. Davis testified that the hospital was 8.2 miles away; according to Ramey it was approximately 8.42 miles away.

Davis had alleged in his complaint that he and his wife were de-

tained for approximately 20 minutes before Ramey called for any medical assistance, and that when he did call for medical assistance he summoned only the emergency rescue squad of the Roswell volunteer fire department. He alleged that the rescue squad called for an ambulance, and approximately 30 more minutes elapsed before it arrived.[1] He presented no evidence in support of these allegations at the trial. When asked, "About how long did it feel like to you before somebody from the fire department got there?," he responded, "I don't know, probably fifteen or twenty minutes." He also stated that he did not know how long it was before the ambulance arrived, but it seemed like a long time. No evidence was introduced to dispute Ramey's testimony that he had called both the rescue squad and the ambulance, and had called them simultaneously.

Ramey testified that he stopped Davis at 6:25 a.m. The police department records show that the dispatcher received Ramey's call that he was making the stop at 6:25 a.m., and they show 6:47 as the time of completion. The records of the Roswell Fire Department show that the rescue squad was dispatched at 6:29, arrived at 6:33 and completed the assignment at 6:47.[2] The records of the ambulance company show that the call was received at 6:28, the ambulance was dispatched at 6:29, arrived at 6:38, was en route to the hospital at 6:47, and arrived there at 6:54. In addition, Ramey testified that after he called for the rescue squad and an ambulance, he radioed for his supervisor and for a backup patrol car. According to Ramey, the supervisor arrived within a minute and a half. The supervisor testified that he began proceeding to the scene when he heard Ramey call for medical help, and that it took him 2-3 minutes to get there. The transcript is not entirely clear, but it appears that the backup patrol car arrived next.[3] Then the rescue squad vehicle, driven by an EMT arrived; the driver testified that at that point he was a student EMT, having had 40 hours of training. As he got out of the truck, two other EMT's

---

[1] This case came before this court previously when Davis appealed from an order of the trial court granting the city's motion for judgment on the pleadings. The city contended that Davis was seeking to hold it liable either for negligent operation of its police force or on a respondeat superior theory. We agreed with the city that it could not "be held liable under 42 USCA § 1983 solely on negligence or respondeat superior theories." *Davis v. City of Roswell*, 250 Ga. 8, 9 (295 SE2d 317) (1982). But we reversed the grant of the city's motion for judgment on the pleadings, referring to 42 USC § 1983 and holding that: "It appears that Davis may be entitled to relief under some state of facts involving the City of Roswell. . . ." Id. at 9.

[2] One fire department document, the incident report, gives the time of dispatch as 6:29 and then gives the time of arrival as 6:23. That apparently should have read 6:33. It also gives the time dismissed as 6:53; the EMT explained that that was when he completed the report and left the scene, which was after the ambulance had left.

[3] This is consistent with Davis' testimony that two police cars arrived before the rescue squad arrived.

arrived. Of those two, only one, the one who took charge, testified. He testified that he had been associated with the Roswell Fire Department since 1974 as a volunteer; that at the time of the incident he was a volunteer fireman and paramedic; that he had had 120 hours of basic EMT training and another 150-60 hours of cardiac technician training; and that he was at that time employed as a paramedic and ambulance driver by Metro Ambulance Service. The EMTs moved Mrs. Davis from her car to the rescue truck; sat her up and tilted her head back to clear her airway; administered oxygen; monitored her vital signs; and communicated her condition to the hospital. When the ambulance arrived, Mrs. Davis was transferred to it and taken to the hospital.

Davis called his next door neighbor, Jean Abt, as a witness. Ms. Abt testified that Davis had called her at approximately 5:45 a.m. and asked her to come over. She dressed and arrived in 5 or 10 minutes. Mrs. Davis was seated in the living room; she did not look well and said she did not feel well. After calling Mrs. Davis' doctor, they decided they would take Mrs. Davis to the hospital and Ms. Abt went home for a jacket; the walk took 3-4 minutes. By the time she came back, Mr. Davis was trying to get his wife into the car. Ms. Abt testified that she thought Mrs. Davis was still conscious, but she was not positive. She also testified that she "guessed" that it was 6:15 or 6:20 when they left the Davis' house. Davis testified that it was 4 miles from his house to where he was stopped.

During Abt's testimony, she was asked if she recalled having given a statement earlier in which she said: "The officer came to verify the fact that Mrs. Davis was in the car and apparently she was ill, and when he did this he told Mr. Davis he should wait for the emergency vehicle or wait for the ambulance." She verified that statement. She also stated: "My impression was that after we were stopped he ascertained that there was an ill person in the car and that he moved quickly to call for help."

Mrs. Davis' doctor's deposition was admitted into evidence. He testified that he had first seen her on May 1, 1980; that she was suffering from cancer of the lung and of the membrane around the heart; that the cancer had also spread to her brain and her kidneys; that when she was discharged from the hospital on May 18, 1980, her condition had improved with regard to her shortness of breath, progressive cough and general malaise, but the prognosis was very poor and guarded. He testified that according to his records she was admitted to the hospital at 6:48 a.m. on May 24; that he examined her at the hospital later that day; and that she died on May 25, 1980, at 12:45 p.m. He also testified that one of the factors which caused her death was cardiogenic shock, that time is of the essence in treatment of cardiogenic shock, and that a delay of 15 minutes to an hour of get-

ting her to the hospital would have been harmful to her.

After the defendant's motions for directed verdicts were over-ruled, the jury returned a verdict for the defendants on Davis' wrongful death claim. As to his civil rights claim, the verdict form queried: "Do you find that either of the defendants [officer Ramey, Chief Joyner, and the City of Roswell] violated the civil rights of the plaintiff?" The jury answered: "Yes." The next question read: "If the answer to the above question is 'Yes,' which defendant or defendants do you find liable?" The jury answered, "T. L. Joyner" and "City of Roswell." The jury went on to award as compensatory damages $5,000 against Joyner and $250,000 against the City.[4]

Defendants Joyner and the City of Roswell then filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court granted j.n.o.v., stating: "The Court, despite a diligent review of the record, has been unable to find any evidence that defendant Ramey acted improperly or that his actions violated the Plaintiff's civil rights. Further the Court has been unable to find any evidence that either Defendant City of Roswell or Defendant Terry L. Joyner established or ratified a policy or took any other action sufficient to impose liability upon them under 42 USC § 1983 . . . ." On appeal, in a split decision, the Court of Appeals reversed, finding that the evidence was conflicting. *Davis v. Ramey*, 174 Ga. App. 417 (330 SE2d 130) (1985). We granted certiorari to determine in this developing area of law "Whether the facts of this case are sufficient, as a matter of law, to impose liability under 42 USC § 1983."

Having reviewed the evidence and construing it in plaintiff's favor, we nevertheless agree with the trial court that the evidence does not establish, in the first instance, that officer Ramey acted improperly or violated the plaintiff's civil rights. Although there are some variances in the evidence, as the Court of Appeals noted, the pertinent evidence is, in fact, remarkably consistent. Ramey maintains he stopped the car because it was being driven erratically. Davis maintains that he had control of his car, except for it's "swaying" as he passed the patrol car. Contrary to the allegations in his complaint, Davis admits that after Ramey saw Mrs. Davis he radioed for help; the only difference is that Davis says Ramey used his car radio and Ramey says he used one in his pocket. Davis, professing no certainty, thinks it was 15-20 minutes before the rescue squad arrived. He does not venture a guess as to how long it was before the ambulance arrived. On the other hand, he thought it was about 6:20 when he was stopped and his wife's doctor testified that she reached the hospital,

---

[4] No issue is raised as to whether different amounts may be awarded as damages against different defendants. See *McKinnon v. City of Berwyn*, 750 F2d 1383, 1387 (7th Cir. 1985).

which was over 8 miles away, at 6:48. Except for this testimony, which places her arrival earlier than any of the other records do, the records are consistent with themselves and with Ramey's testimony.

In sum, what the evidence as a whole shows is that a police officer legitimately stopped a car only to discover that it bore a critically ill woman. He then decided that, rather than allow the driver to proceed or to transport Mrs. Davis in his patrol car, the better course of action was to call for emergency help to render aid and for an ambulance to transport the patient to the hospital, which was over 8 miles away. In addition, he called a supervising officer to the scene as he had been instructed to do.

A conflict in the evidence, however, is created by Davis' testimony that it was "probably fifteen or twenty minutes" before the rescue squad arrived and then "a long time" before the ambulance arrived. But this conflict relates to the response time of the support services, not to the acts of the officer who called them. Liability was not predicated on the response time of these personnel but on alleged inadequate training because of which the officer allegedly mishandled the emergency. There is no evidence that the officer should have anticipated that the response time would be so extended, if it was, as to make a call for help an inappropriate choice.

Furthermore, even assuming that the evidence suffices to show an official policy of inadequate training in handling medical emergencies, more is required. Davis bore the burden of showing not only the existence of an official policy of inadequate medical emergency training, but also a causal connection between the policy and the constitutional deprivation. *City of Oklahoma City v. Tuttle*, 53 USLW 4639 (June 3, 1985). Assuming that Davis established that the City of Roswell consciously chose an inadequate training program (i.e., time on supervised patrol), such inadequacy was ameliorated by the requirement that when confronted with an emergency, the officer call a supervisor to the scene and the undisputed evidence here is that the supervising officer arrived within three minutes. The supervising officer testified that he had been trained at the Northeast Georgia Police Academy and was a certified law enforcement officer, and no attempt was made to establish that his training was inadequate. Therefore, even if the evidence were sufficient to establish that Ramey was inadequately trained as a result of an official policy sufficient to invoke liability under 42 USC § 1983, the causal link was broken by the supervisor's virtually immediate arrival at the scene.

We conclude that the trial court ruled correctly when it granted the defendants' motion for j.n.o.v. The standard for granting a motion for j.n.o.v. and for directing a verdict is the same: "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a par-

ticular verdict, such verdict shall be directed." OCGA § 9-11-50 (a); *Pendley v. Pendley*, 251 Ga. 30 (1) (302 SE2d 554) (1983).

This standard is met in this case; there is no conflict in the evidence as to any material issue and the evidence, with all reasonable deductions therefrom, demanded a verdict in favor of the City and its chief of police. We find that the evidence did not establish that a "policy" of inadequate training sufficient to support liability under 42 USC § 1983 was the cause of the harm suffered by Davis. In so ruling, we note that there is some doubt as to whether such a cause of action exists. See the recent decision in *City of Oklahoma City v. Tuttle*, 53 USLW, supra at 4643 n. 7.

Moreover, we make no decision here as to whether a person may maintain an action for violation of his spouse's civil rights, or whether a person's civil rights are violated when his spouse is harmed by the action of a police officer.

*Judgment reversed. All the Justices concur, except Smith, J., who dissents.*

DECIDED OCTOBER 30, 1985 —
RECONSIDERATION DENIED NOVEMBER 19, 1985.

*Dennis, Corry, Webb & Carlock, Dennis J. Webb, Brian A. Boyle,* for appellants.
*Clifford H. Hardwick,* for appellee.