A99A0680. HOWARD et al. v. CITY OF COLUMBUS et al.
A99A1258. HOWARD et al. v. CHASE.
(521 SE2d 51)

ELDRIDGE, Judge.

At 1:20 a.m. on May 25, 1992, James Howard, Jr., a prisoner of the City of Columbus, Muscogee County, died of diabetic ketoacidosis at Columbus Medical Center. Conswella L. Howard, his minor daughter, by and through her natural and legal guardian, Stephanie Corbin, brought a wrongful death action, and Stephanie Corbin, as temporary administratrix of the estate of James Howard, Jr., brought a personal injury action against the City of Columbus, Muscogee County; J. E. "Gene" Hodge, individually and in his official capacity as Sheriff of Muscogee County; Dr. Jerry Stephen Chase, individually and in his official capacity as jail medical director; and three jail licensed practical nurses, Mildred Chapman, Ava J. McLeod, and Lawrence Thompson, individually and in their official capacities. Plaintiffs contended that Howard received such grossly incompetent and inadequate medical care or such refusal to provide essential care so as to evidence an intentional violation of his constitutional rights. The following were the basis for plaintiffs' actions: Counts 1 through 4 were premised upon a violation of the statutory duty to provide medical care under OCGA § 42-5-2, and the common law duty and the state constitutional duty as personal injury and wrongful death actions; Count 5 was a medical malpractice action for personal injury and wrongful death; and Count 6 was a 42 USCA §§ 1983 and 1988 action for violation of due process and the Eighth Amendment of the United States Constitution prohibiting cruel and unusual punishment.

After extensive discovery, all the defendants moved for summary judgment on all counts. On August 6, 1998, oral argument was held. On August 11, 1998, the trial court granted summary judgment on all counts against the plaintiffs. On December 10, 1998, the trial court granted Dr. Chase's motion for summary judgment as well. Plaintiffs timely filed their notice of appeal.

The record shows that Howard was a diabetic with hypertension. By policy, the intake screening in the Muscogee County jail was performed by a deputy with no medical training who did not take a medical history for diabetes or hypertension and looked only for observable physical conditions or injuries. Thus, Howard's jail records did not flag his medical condition. After his incarceration on October 1, 1991, lack of proper diet and medication caused Howard's diabetic condition to worsen over time. By April 1992, Howard's diabetic condition had deteriorated to the extent that he appeared visibly sick to a lay person.

On April 23, 1992, Howard's cellmate, Melson, prepared a sick-call slip for Howard, because Howard was too weak to do it for himself. Within the week, Melson prepared two or three more sick-call slips for Howard. By the first week in May, Howard experienced symptoms of overheating, craving of water, dizziness, constipation, and fainting. After one fainting spell, Howard was examined in the cell by a deputy. At other times, when the cellmates told the jailors that Howard was seriously sick or had fainted, the jailors did not even look at him or do anything to determine if he was sick. Howard lost considerable weight, i.e., 30 to 40 pounds, and had a shrunken face, indicating to a lay person that he was profoundly sick and had a serious medical need.

On May 22, 1992, Officer J. V. Kennedy learned that Howard was sick. Kennedy talked by telephone to LPN Mildred Chapman in the clinic at 8:30 a.m. Chapman did nothing. Kennedy called again at 10:30 a.m., but Chapman said that the clinic was full. At 2:00 p.m., Kennedy saw Chapman in person and told her that Howard appeared very sick and in serious need of medical care. Chapman refused to see Howard. Kennedy was sufficiently concerned over Howard's condition that he notified his supervisor, Lt. Wanda Clemmons, about Howard and Chapman's refusal to see Howard. Clemmons merely told him to prepare a written report of the incident. This was another policy or procedure of the jail regarding medical care.

On May 23, 1992, at 8:00 a.m., Howard manifested symptoms of profound weight loss, total absence of appetite, slurred speech, lethargy, fainting, blurred vision, and profound weakness. He had to be carried to the clinic. Howard had a heart rate of 148 beats per min-

ute. Although the protocol required that 911 be called when a prisoner's heart rate exceeded 120 bpm, LPN Lawrence Thompson did not call 911 or Dr. Chase, but gave Howard medication for high blood pressure that had been preapproved for such general use. However, such medication was dangerous for a diabetic. Howard was kept in the clinic from 11:00 a.m. until 7:00 p.m., when he was returned to his cell. Howard was never seen by a physician. At 11:00 p.m., Howard was returned to the clinic. He told LPN Ava McLeod that he was dying. At that time, he had an unsteady gait, blurry vision, faintness, a heart rate of 126 bpm, and a rebounding pulse of 136 bpm. The LPN did not call an ambulance or Dr. Chase, but continued to treat him only for high blood pressure by changing the blood pressure medication.

After Howard's return to the clinic at 11:00 p.m. on May 23, 1992, Deputy Gary Nicholson observed Howard in the holding cell and observed that Howard appeared "rough," in distress, lethargic, incoherent, and thirsty. Howard had an overwhelming odor of sweet ammonia about him. LPN McLeod told Nicholson that she thought that Howard was a diabetic. While LPNs had the authority to call 911 for an ambulance, the policy was that, because of cost, an ambulance was not to be called except in the case of a medical emergency. LPN McLeod consulted by telephone with Dr. Chase, who was on call. Dr. Chase neither came to the clinic to examine Howard nor ordered that Howard be sent to the emergency room at the hospital. By telephone, Dr. Chase ordered a change in blood pressure medication without knowing Howard's clinical signs and symptoms.

After 6:30 a.m. Sunday, May 24, 1992, Howard was returned to his cell by LPN Thompson. Howard told his cellmate Melson that he was dying. The cellmates created a commotion to get the deputies to do something about Howard, because Howard appeared to them to be critically ill. At 7:00 a.m., LPN Thompson arrived with a deputy at the cell, and Howard was again carried to the clinic. At 1:40 p.m., Howard's father and sister came to the jail, and Howard was taken to the visitors area, but Howard could not talk and fainted. Howard was then returned to the clinic. At 1:55 p.m., Howard's heart rate increased to 144 bpm, and his blood pressure dropped. A jailor became sufficiently concerned that he called 911; LPN McLeod called Dr. Chase to tell him that the deputy had called for the paramedics. Dr. Chase did not come to the jail.

At 2:10 p.m. on May 24, 1992, as a result of the telephone call from the jailor, two paramedics, Jim Waites and William Moore, arrived. They immediately detected acetone on Howard's breath. Howard was in a near coma and in a wheelchair. He was lethargic and could not keep his eyes open; he was non-responsive to voice commands and responded only to pain; and he lacked a grasp. The

paramedics administered a simple glucose fingerstick test, which registered the maximum for glucose. Based on this simple test, it was their immediate opinion that Howard was diabetic. At the hospital, Howard registered 1200+ on the blood workup.

At 1:00 a.m. on May 25, 1992, after removal from the jail to the Medical Center, Howard stopped breathing. He died at 1:20 a.m. *Held*:

### Case No. A99A0680

The plaintiffs set forth six enumerations of error, all of which state different reasons why the trial court erred in granting summary judgment to the defendants. For a proper analysis, the theories of liability must be examined on the basis of federal and state claims.

1. The plaintiffs contend that the trial court erred in granting summary judgment on Howard's 42 USCA § 1983 claims for violating Howard's rights under: (a) the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment, i.e., grossly inadequate medical care and failure to treat Howard, and (b) the Due Process Clause. We agree.

(a) Liability on an action under 42 USCA § 1983 prohibiting cruel and unusual punishment as a violation of Eighth Amendment rights under the United States Constitution exists through "acts [and] omissions sufficiently harmful to evidence deliberate indifference to serious medical needs," of an inmate in jail. *Estelle v. Gamble*, 429 U. S. 97, 106 (97 SC 285, 50 LE2d 251) (1976).

> Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. . . . *Whitley* [*v. Albers*, 475 U. S. 312, 319 (106 SC 1078, 89 LE2d 251) (1986)].

(Punctuation omitted.) *Alford v. Osei-Kwasi*, 203 Ga. App. 716, 718-719 (2) (418 SE2d 79) (1992); accord *Cantrell v. Thurman*, 231 Ga. App. 510, 512 (1) (499 SE2d 416) (1998); *Webb v. Carroll County*, 229

Ga. App. 584 (494 SE2d 196) (1997).

> To state an Eighth Amendment violation for inadequate medical care under *Estelle v. Gamble*, supra, it must be shown that [Howard's] treatment was "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness or where the medical care is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Rogers v. Evans*, 792 F2d 1052, 1058 (11th Cir. 1986).

*Alford v. Osei-Kwasi*, supra at 722-723 (6); accord *Cantrell v. Thurman*, supra at 512; *Webb v. Carroll County*, supra. "Also, delay in access to medical care that is tantamount to unnecessary and wanton infliction of pain may constitute deliberate indifference to a prisoner's serious medical needs." (Citations and punctuation omitted.) *Adams v. Poag*, 61 F3d 1537, 1544 (11th Cir. 1995); see also *Brown v. Hughes*, 894 F2d 1533, 1537 (11th Cir. 1990). "If [jailors] delay or deny access to medical care . . ., the [E]ighth [A]mendment is violated. . . . [A] refusal to provide essential care violates the [E]ighth [A]mendment." *Rogers v. Evans*, supra at 1058.

> All [Eighth Amendment medical] cases require knowledge of the medical needs of the plaintiff and the intentional refusal to provide such necessary care in order for such conduct to constitute "deliberate indifference" as an Eighth Amendment violation within *Estelle*. Our cases have consistently held that "knowledge of the need for medical care" and "an intentional refusal to provide that care" constitute "deliberate indifference." . . . *Carswell v. Bay County*, 854 F2d 454, 457 (11th Cir. 1988); *Ancata v. Prison Health Svcs.*, 769 F2d 700, 704 (11th Cir. 1985).

(Emphasis omitted.) *Merritt v. Athens Clarke County*, 233 Ga. App. 203, 205 (1) (504 SE2d 41) (1998).

> We hold instead [as to the meaning of deliberate indifference] that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U. S. 825, 837 (B) (1) (114 SC 1970, 128 LE2d

811) (1994); accord *Yizar v. Ault*, 265 Ga. 708, 709 (462 SE2d 141) (1995); *Merritt v. Athens Clarke County*, supra at 208.

However, "an Eighth Amendment claimant need not show that a [jailor] acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, supra at 842. "To state an Eighth Amendment violation for inadequate medical care under *Estelle v. Gamble*, supra, it must be shown that [Howard's] treatment was 'so grossly incompetent, inadequate or excessive . . . or [was] a refusal to provide essential care.' [Cit.]" *Alford v. Osei-Kwasi*, supra at 722-723 (6). Thus, knowledge for the purpose of deliberate indifference means an awareness that the inmate needs medical care because of a serious risk of harm from illness or injury, as evidenced by the clinical signs and symptoms that are readily observable by a reasonable person. Knowledge for the purpose of deliberate indifference does not require a final diagnosis, correct diagnosis, or a complete medical history when the inmate has not been allowed to see and to be examined by a physician or when medical care has been unreasonably delayed. *Adams v. Poag*, supra at 1544; *Brown v. Hughes*, supra at 1538; *Carswell v. Bay County*, supra at 457.

Such knowledge may be shown by circumstantial evidence by demonstrating that the surrounding facts and circumstances are such that a reasonable person would know and appreciate the risk of harm from a serious medical need, unless they were deliberately indifferent. A defendant will rarely make the admission of an awareness and appreciation that the inmate was in serious need of medical care to avoid the risk of harm, because to do so is an admission of subjective indifference, i.e., admission of a culpable state of mind and liability. *Merritt v. Athens Clarke County*, supra at 208. "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference." (Citation omitted.) *Adams v. Poag*, supra at 1544; accord *Ancata v. Prison Health Svcs.*, supra at 704. "A medical need is serious if it is '. . . one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' [Cits.]" *Ramos v. Lamm*, 639 F2d 559, 575 (10th Cir. 1980). "A series of incidents closely related in time may disclose a pattern of conduct amounting to deliberate indifference. Repeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results." (Citations omitted.) *Rogers v. Evans*, supra at 1058-1059; accord *Todaro v. Ward*, 565 F2d 48, 52 (2nd Cir. 1977); *Harris v. Thigpen*, 941 F2d 1495, 1505 (11th Cir. 1991); *Ramos v. Lamm*, supra at 575. "When [jail guards or medical personnel] ignore without explanation a prisoner's serious medical

condition that is known or obvious to them, the trier of fact may infer deliberate indifference." (Citations omitted.) *Brown v. Hughes*, supra at 1538. Therefore, such subjective deliberate indifference may be proven as a reasonable inference drawn from circumstantial evidence of the surrounding facts and circumstances.

(i) In this case, repeatedly denying an obviously sick inmate with a serious medical need access to a physician or a hospital emergency room where proper medical diagnosis and treatment can be made does not escape from the Eighth Amendment prohibition against denial of medical care simply because neither jailors nor paramedical personnel know what is specifically wrong with the inmate, other than that he is seriously sick. *Adams v. Poag*, supra; *Brown v. Hughes*, supra. Such repeated and prolonged denial of access to a physician for an obviously seriously sick inmate constitutes deliberate indifference and reckless conduct. *Farmer v. Brennan*, supra at 842. Ignorance is not bliss; otherwise, a premium would be placed upon ignorance in order to escape liability when an illness is not diagnosed and the sufferer is allowed to slowly die without proper diagnosis or treatment. Therefore, repeated denial, delay, insufficient or inappropriate medical care of an obviously sick inmate in serious need of medical care constitutes circumstantial evidence of subjective, deliberate indifference. See *Whitley v. Albers*, supra at 321; *Estelle v. Gamble*, supra at 103-104; *Wilson v. Seiter*, 501 U. S. 294, 296-299 (111 SC 2321, 115 LE2d 271) (1991); *Anderson v. City of Atlanta*, 778 F2d 678, 686, n. 12 (11th Cir. 1985); *Merritt v. Athens Clarke County*, supra at 208.

Here, jail LPNs deliberately ignored the pleas of Howard, his cellmates, and deputies either to have a physician examine Howard or to send him to the hospital, and — finally — a medically untrained *deputy* was forced to call 911 for paramedics; such evidence (plus the evidence of the serious medical needs of Howard from the same witnesses) constitutes some circumstantial evidence of their culpable state of mind, i.e., subjective deliberate indifference, because such acts or omissions are not negligent but require a conscious decision to act or not to act. See *Merritt v. Athens Clarke County*, supra at 208; *Van Alstine v. Merritt*, 222 Ga. App. 734, 735 (1) (476 SE2d 6) (1996); *Johnson v. Jones*, 178 Ga. App. 346, 348 (343 SE2d 403) (1986); see also *Wilson v. Seiter*, supra at 296-299.

The government has a duty to provide minimally adequate medical care to its inmates. *West v. Atkins*, 487 U. S. 42, 54 (108 SC 2250, 101 LE2d 40) (1988); *Harris v. Thigpen*, supra. However, adequate medical care means that level of medical care reasonably commensurate with modern medical science and a quality of care acceptable within prudent professional standards; it means a level of health services that is reasonably designed to meet routine as well as emer-

gency medical care. *Fernandez v. United States*, 941 F2d 1488, 1493-1494 (11th Cir. 1991); *United States v. DeCologero*, 821 F2d 39, 43 (1st Cir. 1987); *Ramos v. Lamm*, supra at 574. Where the inmate demonstrates that the medical care system is inadequate, so that he is effectively denied access to medical care for his condition, liability has been established. *Anderson v. City of Atlanta*, supra at 686-687, n. 12; *Ancata v. Prison Health Svcs.*, supra at 703, n. 5; accord *Garcia v. Salt Lake County*, 768 F2d 303, 308 (10th Cir. 1985); *Wellman v. Faulkner*, 715 F2d 269, 272-274 (7th Cir. 1983); *Ramos v. Lamm*, supra at 574-575; *Todaro v. Ward*, supra at 52. The absence of proper care and the policy underlying such lack of care constitute objective, deliberate indifference. *Merritt v. Athens Clarke County*, supra at 206-207.

Here, there is evidence that a life-threatening, serious medical need existed, because Howard died from his untreated diabetic ketoacidosis. Accordingly, the evidence raises a factual question as to whether the defendants' response to such serious medical need amounted to deliberate indifference. *Farmer v. Brennan*, supra at 837 (B) (1); *Adams v. Poag*, supra; *Merritt v. Athens Clarke County*, supra at 207. As an established policy or practice, the LPNs' examination, treatment, and delay in transfer to a hospital of an obviously critically ill inmate, rather than examination and treatment by a physician, constitute such totally inadequate medical care that a jury may find that it constituted non-treatment. Thus, such non-treatment, as a consequence of such policy, would be the proximate cause of Howard's death. *Collins v. City of Harker Heights*, 503 U. S. 115, 120-124 (112 SC 1061, 117 LE2d 261) (1992).

(ii) As to Sheriff Hodge, his liability arises from his failure to supervise the jail employees. See also Division 2 (b), infra.

> We apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation. [Cit.]

*Adams v. Poag*, supra at 1544; see also *Ancata v. Prison Health Svcs.*, supra at 706. As to each prong, plaintiffs have presented sufficient evidence to raise an issue of material fact for jury determination.

In this case, the policies of Columbus, Muscogee County, a governmental entity, constitute a violation of constitutional rights by

providing for potentially inadequate, delayed, or insufficient medical care and treatment and raise a factual question as to the causation of Howard's death. Here, the policy caused the constitutional violation as the "moving force," which was executed by its employees. *Monell v. Dept. of Social Svcs.*, 436 U. S. 658, 690-694 (98 SC 2018, 56 LE2d 611) (1978). Such policy or policies constituted the evidence of actual deliberate indifference. *Merritt v. Athens Clarke County*, supra at 207. "If the government itself is to be held liable, as opposed to holding its employees liable individually, then such liability must arise from a governmental policy of action or inaction that caused the constitutional violation, as well as the injury." Id. at 206.

In this case, such has been shown, because the LPNs and Dr. Chase acted or refused to act due to the implementation of such governmental policy of providing insufficient care and treatment of Howard and excessively delaying his transportation to the hospital for budget reasons. Such acts or omissions of the employees and agents were not individual acts of negligence or vindictiveness, but were within the policy of providing inadequate treatment. *Bd. of County Commrs. of Bryan County v. Brown*, 520 U. S. 397, 403-407, 411 (117 SC 1382, 137 LE2d 626) (1997); *Monell v. Dept. of Social Svcs.*, supra at 691-695; *Merritt v. Athens Clarke County*, supra at 206. The subjective element of "deliberate indifference" is evidenced by the acts and omissions of Chase, Chapman, McLeod, and Thompson in implementing such policies. Id. at 207. "[A] claim of deliberate indifference to a prisoner's serious medical needs has two components: whether evidence of a serious medical need exists; [and] if so, whether the defendants' response to that need amounted to deliberate indifference. [Cit.]" *Adams v. Poag*, supra at 1543. As to the first prong in this case, death established that the medical need was serious; as to the latter, the evidence presented by the plaintiffs makes it a jury question.

Under *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), plaintiffs raised sufficient issues of material fact that the trial court should have denied the defendants' motions for summary judgment on the federal issues. See OCGA § 9-11-56 (e).

> Thus, [with some evidence in and permissible reasonable inferences from] the record that a jailor/prison official acted or failed to act, despite knowledge of the substantial risk of harm to [an inmate] of permanent injury under the policy, there is [the creation of a material issue of fact] by the plaintiff on summary judgment [by coming] forward with evidence of subjective deliberate indifference, [in addition to] evidence of objective deliberate indifference. [Cits.]

*Merritt v. Athens Clarke County*, supra at 208.

(iii) Plaintiffs provided evidence that, prior to Howard's death from diabetes, the defendants engaged in deliberate indifference through a policy and pattern of practice in not treating diabetics.[1] The fact that ten to thirteen inmates have died from diabetes while in custody between 1980 and 1992 is some evidence of deliberate indifference to providing appropriate medical care and treatment for diabetics. As early as 1986, Dr. Bruce Newsome and physician's assistant Richard Holmes warned that the identification, care, and treatment of diabetics was inadequate and that preventable deaths were needlessly occurring. Sheriff Hodge, Dr. Newsome, and Roy Reese, Director of Risk Management, were aware specifically that diabetic inmates were at risk.

(iv)

> The allegations of one denied medical attention and incarcerated [when sick] have been held to state a cause of action under 42 USCA § 1983. *Hughes v. Noble*, 295 F2d 495 (5th Cir. 1961). The federal courts have demonstrated concern that where needed medical care is refused the denial or improvident delay of such aid may constitute deprivation of constitutional due process. *Fitzke v. Shappell*, 468 F2d 1072 (6th Cir. 1972).

*Davis v. City of Roswell*, 250 Ga. 8 (295 SE2d 317) (1982); accord *Cantrell v. Thurman*, supra at 512-513 (2); see *Collins v. City of Harker Heights*, supra at 119-120.

Thus, the policies of conducting a restrictive medical history and inmate intake examination with undertrained deputies who do not inquire regarding or examine for diabetes and hypertension; having LPNs examine and treat seriously ill inmates with significant medical needs without a physician present and seeing a seriously sick patient without a physician examining the inmate within a reasonable time thereafter; having the physician consulting with the LPN by telephone instead of directly observing, examining, and working up the seriously sick inmate or performing a follow-up examination; having the LPNs continuing to see a chronically seriously ill inmate without a physician *ever* examining the inmate; narrowly defining a medical emergency so that an obviously sick inmate is not transported to a hospital emergency room in the absence of a physician examining him in the clinic; and designing medical protocols which

---

[1] For example, on March 6, 1992, inmate Eric Killibrew required emergency treatment for diabetic ketoacidosis. On March 22, 1992, inmate David Lewis had to be hospitalized for diabetic ketoacidosis.

are primarily for cost effectiveness and to save money by limiting direct physician care and hospitalization of seriously ill inmates — all such policies demonstrate a question of fact for the jury as to whether they constitute "deliberate indifference."

(b) Deliberate indifference to serious medical needs by governmental custodians violates Due Process. However, unlike an Eighth Amendment violation, a Due Process violation does not require subjective deliberate indifference; such violation requires action under color-of-law and causation, as in an Eighth Amendment violation. See *City of Roswell v. Davis*, 255 Ga. 158, 163 (335 SE2d 582) (1985).

> [P]laintiff must establish a causal connection between any policy of inadequate medical care or omissions of medical care and the constitutional deprivation of due process rights [or an Eighth Amendment violation]. *City of Roswell v. Davis*, [supra at 163]. "A plaintiff in a [42 USCA] § 1983 action must show (1) that he has been deprived of a right secured by the constitution and laws of the United States, and that (2) the defendant acted under color of state law."

*Cantrell v. Thurman*, supra at 512-513; *Poss v. Moreland*, 253 Ga. 730, 731-732 (324 SE2d 456) (1985); accord *City of Cave Spring v. Mason*, 252 Ga. 3, 4-5 (310 SE2d 892) (1984).

Here, the medical policies were promulgated and carried out under the mandate of a state statute requiring that a county provide adequate medical care for its inmates. OCGA § 42-5-2. Howard was never examined by a physician in the jail clinic from April 23, 1992, through May 25, 1992, when he died. Howard was seen only by under-trained LPNs under the practices and policies promulgated by the defendants. It was only after Howard reached a diabetic stupor that a *jailor*, not jail medical personnel, called 911 for an ambulance to transport Howard to the hospital emergency room. When the paramedics examined Howard, they immediately suspected diabetes from the acetone smell on Howard's breath, his respiration, and his non-responsiveness except to pain. Therefore, the paramedics administered a simple fingerstick glucose test that showed the maximum glucose level possible of 400+ on that device, indicating diabetes. Thus, Howard's critical medical condition was obvious to a properly trained paramedic. The LPNs should have recognized earlier the clinical signs and symptoms of diabetes or realized, at the minimum, that this profoundly sick inmate needed to see a physician. This was a violation of a constitutional right that was coupled with causation.

> The Supreme Court . . . set forth an analysis of the "under-color-of-state-law" part of the . . . two-part require-

ment. The conduct causing the deprivation must be fairly attributable to the state in order to be conduct "under-color-of-state-law." This is characterized as the "fair attribution" test. It is itself broken into a two part approach which we outline here for ease in application to the facts of this case[:] A. The deprivation must be caused by: (i) The exercise of some right or privilege created by the state, or (ii) a rule of conduct imposed by the state, or (iii) a person for whom the state is responsible. B. The party charged with the deprivation must be a "state actor" in that: (i) He is a state official, or (ii) he has acted together with or has obtained significant aid from state officials, or (iii) his conduct is otherwise chargeable to the state. A and B are separate requirements each of which is necessary to establish conduct "under-color-of-state-law."

*Poss v. Moreland,* supra at 731-732, citing *Lugar v. Edmondson Oil Co.,* 457 U. S. 922 (102 SC 2744, 73 LE2d 482) (1982); accord *Cantrell v. Thurman,* supra at 513. Thus, under this test, a fact question exists as to whether there is a causal connection between the implementation of jail medical policies under-color-of-state-law and Howard's death.

2. Plaintiffs contend that the trial court erred in granting summary judgment on their various state claims.

(a) While OCGA § 42-5-2 (a) imposes the duty and the cost for medical care of inmates in the custody of a county upon the county, such statute did not waive sovereign immunity of the county or its agents and employees. Art. I, Sec. II, Par. IX of the 1983 Georgia Constitution created constitutional sovereign immunity for the state and its political subdivisions. The Georgia Tort Claims Act, OCGA § 50-21-20 et seq., specifically excluded tort suits against counties.

Further, the county sheriff in his official capacity is immune from tort liability in performing an official function and may be liable only to the extent that the county had waived sovereign immunity by statute. See *Seay v. Cleveland,* 270 Ga. 64, 65 (1) (508 SE2d 159) (1998); *Gilbert v. Richardson,* 264 Ga. 744 (452 SE2d 476) (1994). "[A] county is not liable to suit for any cause of action unless made so by statute." OCGA § 36-1-4. "This includes actions brought under a theory of negligence as the plaintiffs have asserted in this case. *Early County v. Fincher,* 184 Ga. App. 47, 49 (2) (360 SE2d 602) (1987)." (Punctuation omitted.) *Schulze v. DeKalb County,* 230 Ga. App. 305, 307 (496 SE2d 273) (1998). Thus, the City of Columbus, Muscogee County, as well as Sheriff Hodge and LPNs Chapman, McLeod, and Thompson in their official capacities, are all protected from tort action by sovereign immunity. See *Seay v. Cleveland,* supra at 65;

*Gilbert v. Richardson*, supra.

(b) Sheriff Hodge and LPNs Chapman, McLeod, and Thompson were all sued in their individual capacities, as well as their official capacities.

"[Hodge] might be held liable for negligent supervision [when he has] been sued in his personal capacity[.] [Cit.]" *Seay v. Cleveland*, supra at 65; see also *Gilbert v. Richardson*, supra at 754. Since the requirements of supervision, including adequate training and enforcement of all policies, practices, and protocol, are ministerial in nature, then, in his individual capacity, Sheriff Hodge has no protection by official or qualified immunity. See *Seay v. Cleveland*, supra at 65-66, n. 1; see also *Gilbert v. Richardson*, supra at 750.

Providing adequate medical attention for inmates under defendants' custody and control is a ministerial act by the sheriff and his or her deputies . . . because medical care is a fundamental right and is not discretionary in requiring medical care; thus, such act is *not* subject to either sovereign immunity or official immunity. OCGA §§ 42-4-4 (a) (2); 42-5-2 (a); *Davis v. City of Roswell*, supra; *Johnson v. Mayor &c. of Carrollton*, 249 Ga. 173 (288 SE2d 565) (1982); *Macon-Bibb County Hosp. Auth. v. Houston County*, 207 Ga. App. 530 (428 SE2d 374) (1993); *Webb v. Carroll County*, supra; *Cherokee County v. North Cobb Surgical Assoc.*, 221 Ga. App. 496, 499 (2) (471 SE2d 561) (1996); *Alford v. Osei-Kwasi*, supra. In contrast, the determination of *what* medical treatment to provide *is* an act of discretion subject to official immunity. See *Schmidt v. Adams*, 211 Ga. App. 156, 157 (438 SE2d 659) (1993).

(Emphasis in original.) *Cantrell v. Thurman*, supra at 514 (4).

The dissent cites *Lowe v. Jones County*, 231 Ga. App. 372, 373 (499 SE2d 348) (1998) for the proposition that training and supervision of law enforcement personnel were discretionary acts. In that case, the sheriff was sued in his official capacity only but had the protection of sovereign immunity rather than official immunity for the conduct of a deputy in attempting to arrest a motorist for DUI. See *Seay v. Cleveland*, supra at 65; *Gilbert v. Richardson*, supra at 754. In this case the sheriff was sued in his individual capacity as well as his official capacity. If the dicta in *Lowe v. Jones County*, is a correct statement of the law, then, as stated in dicta of the Supreme Court, "[a]lthough [the sheriff] might be held liable for negligent supervision had he been sued in his personal capacity," in *Seay v. Cleveland*, supra, based upon *Gilbert v. Richardson*, supra, is to be treated as an incorrect statement of the law by the dissent and accorded no force

and effect? If the statement of the Supreme Court is a correct statement of law, then supervision in a personal capacity is not discretionary but ministerial. The dissent relies upon cases dealing with supervision of law enforcement personnel as a discretionary rather than a ministerial act; such authority does not deal with jailors, who lack peace officer certification, nor medical personnel. Therefore, any language in such opinions as to ministerial versus discretionary acts of non-peace officers was dicta.

*Schmidt v. Adams*, supra, is good law but inapplicable to the facts of this case, because such case was based upon a failure to diagnose by the physician's assistant-nurse, a discretionary act, and physician's assistants under OCGA § 43-34-101 et seq. have broad discretion to carry out medical treatment under the supervision of a physician that a registered nurse or an LPN cannot perform. In this case, the LPNs exercised no discretion, because they failed to allow the patient to be examined by a physician when the clinical signs and symptoms under the protocol mandated either a physician examination or an ambulance to take the prisoner to the emergency room, failed to accurately report the existing signs and symptoms to the jail physician on call, and failed to act in following clearly set out guidelines, all ministerial acts requiring no exercise of deliberation and judgment. Thus, *Schmidt v. Adams* is distinguishable from this case.

An LPN has the least training and can exercise the least discretion as a licensed health care provider. See OCGA § 43-26-30 et seq.

> "The practice of licensed practical nursing" means the provision of care for compensation, under the supervision of a physician practicing medicine, a dentist practicing dentistry, a podiatrist practicing podiatry, or a registered nurse practicing nursing in accordance with applicable provisions of law. Such care shall relate to the maintenance of health and prevention of illness through acts authorized by the board, which shall include, but not be limited to, the following: (A) Participating in the assessment, planning, implementation, and evaluation of the delivery of health care services and other specialized tasks when appropriately trained and consistent with board rules and regulations; (B) Providing direct personal patient observation, care, and assistance in hospitals, clinics, nursing homes, or emergency treatment facilities, or other health care facilities in areas of practice including, but not limited to: coronary care, intensive care, emergency treatment, surgical care and recovery, obstetrics, pediatrics, outpatient services, home health care, or other such areas of practice; (C) Performing comfort and safety measures; (D) Administering treatments and medica-

tion; and (E) Participating in the management and supervision of unlicensed personnel in the delivery of patient care.

OCGA § 43-26-32 (7).

A registered nurse requires a different license and qualifications from an LPN; therefore, an RN has greater discretion in patient care. See OCGA § 43-26-1.

> "Practice nursing" or "practice of nursing" means to perform for compensation or the performance for compensation of any act in the care and counsel of the ill, injured, or infirm, and in the promotion and maintenance of health with individuals, groups, or both throughout the life span. It requires substantial specialized knowledge of the humanities, natural sciences, social sciences, and nursing theory as a basis for assessment, nursing diagnosis, planning, intervention, and evaluation. It includes, but is not limited to, provision of nursing care; administration, supervision, evaluation, or any combination thereof, of nursing practice; teaching; counseling; the administration of medications and treatments as prescribed by a physician practicing medicine in accordance with Article 2 of Chapter 34 of this title, or a dentist practicing dentistry in accordance with Chapter 11 of this title, or a podiatrist practicing podiatry in accordance with Chapter 35 of this title.

OCGA § 43-26-3 (6).

The dissent cites *Edwards v. Dept. of Children &c. Svcs.*, 236 Ga. App. 696, 699 (512 SE2d 339) (1999) and mistakes the discretionary health care powers set forth in this case, which only RNs possess, with the limited discretionary powers of an LPN in this case. As described in the licensing statutes, the discretion is not the same. While this case merely says "nurses," their discretionary powers by statute are neither conferred upon nor exercisable by LPNs. See OCGA § 43-26-32 (7). Further, the dissent fails to distinguish *Edwards v. Dept. of Children &c. Svcs.*, supra, an action under the Georgia Tort Claims Act, OCGA § 50-21-23 waiving sovereign immunity, from a suit against a city/county employee under official immunity. OCGA § 50-21-22 (2) defines "discretionary function or duty" for purposes of the Georgia Tort Claims Act only; it is "a function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors." Even under the Georgia Tort Claims Act, this court's interpretation of "discretionary function" in *Edwards v. Dept. of Children &c. Svcs.*, supra, appears to

be an overly broad statutory construction. "The scope of the discretionary function exception urged by [the dissent], which would include any decision affected by 'social, political, or economic factors,' is so broad as to make the exception swallow the waiver." *Dept. of Transp. v. Brown*, 267 Ga. 6, 7 (1) (471 SE2d 849) (1996); accord *Dept. of Transp. v. Brown*, 218 Ga. App. 178, 180-182 (2) (460 SE2d 812) (1995). Clearly, *Edwards v. Dept. of Children &c. Svcs.*, supra, is distinguished from this case on both the law and facts.

Further, since the sheriff and the LPNs were sued in their individual capacities, the record raised serious questions as to conscious indifference by such defendants as to the deceased's medical condition and treatment so that a jury could find that their conduct amounted to wilfulness, malice, or corruption as actual malice. See *Merrow v. Hawkins*, 266 Ga. 390 (467 SE2d 336) (1996). Thus, the trial court erred in granting summary judgment on such issue.

As to LPNs Chapman, McLeod, and Thompson, to the extent that their failure to diagnose or to treat appropriately was a discretionary act, qualified or official immunity protected them from tort liability. See *Gilbert v. Richardson*, supra at 750; *Schulze v. DeKalb County*, supra at 308. However, to the extent that their refusal or delay in administering medical care and treatment and their refusal to call an ambulance when Howard's condition exceeded the protocol mandating transfer to the hospital did not require the exercise of discretion, they lack qualified or official immunity for performance of their ministerial duties. See *Seay v. Cleveland*, supra at 65-66, n. 1; *Gilbert v. Richardson*, supra at 750.

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

(Citations and punctuation omitted.) *Schulze v. DeKalb County*, supra at 308 (2).

Thus, some of the LPNs' acts or omissions are entitled to official immunity while other acts or omissions constitute ministerial conduct for which they may be found liable in tort. Therefore, the trial court erred in granting summary judgment as to those ministerial acts and omissions.

### Case No. A99A1258

3. Plaintiffs contend that the trial court erred in granting sum-

mary judgment to Dr. Chase on the 42 USCA § 1983 action for violating Howard's due process rights and his rights under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment, i.e., grossly inadequate medical care and failure to treat Howard. We agree for the reasons set forth in Division 1, which controls.

4. Plaintiffs contend that the trial court erred in granting summary judgment on their various state claims as to Dr. Chase. We agree.

As a county employee acting in his official capacity, Dr. Chase was covered by sovereign immunity while acting as medical director for the jail, because he was performing such duties in the course of his employment with the city; therefore, he cannot be liable for negligent supervision or training of the medical staff at the jail or for its policies. See Art. I, Sec. II, Par. IX, 1983 Ga. Const.; OCGA § 50-21-20 et seq.; *Seay v. Cleveland,* supra at 65 (1); *Harry v. Glynn County,* 269 Ga. 503, 505 (501 SE2d 196) (1998); *Gilbert v. Richardson,* supra; *Schulze v. DeKalb County,* supra at 308; *Jackson v. Miller,* 176 Ga. App. 220 (335 SE2d 438) (1985).

However, as a medical doctor, he was not acting in the course of his official duties as a county employee and jail medical director when he failed to act in this case, but, instead, was acting as a physician, so that his alleged negligence was simply that of a medical doctor who failed to provide treatment to a patient. His primary duty in this instance was to his patient rather than to the city. *Keenan v. Plouffe,* 267 Ga. 791, 794 (2) (482 SE2d 253) (1997); see also *Davis v. Stover,* 258 Ga. 156 (366 SE2d 670) (1988); *Schmidt v. Adams,* supra at 157-158; *Jackson v. Miller,* supra; *Roberts v. Grigsby,* 177 Ga. App. 377, 378 (339 SE2d 633) (1985); cf. dicta in *Cantrell v. Thurman,* supra at 515. A physician's professional standing creates a trusting relationship that cannot be breached with impunity. A professional person is liable for an abuse of the trust reposed in him by the public, provisions of the compensation notwithstanding. A prisoner is compelled to trust that his treatment will be made by the doctor's independent professional judgment. Because of the relationship between physicians and patients, jail physicians cannot use the sovereign immunity law as a shield to insulate themselves from individual liability for medical malpractice claims. *Keenan v. Plouffe,* supra at 795.

Since Dr. Chase failed to go to the jail and examine or treat Howard or to have him transferred to the hospital, instead choosing to order a change in medication without knowing all of the clinical signs and symptoms that a reasonable examination would disclose, there was no exercise of discretion as to Howard's diagnosis and treatment. Therefore, *Swofford v. Cooper,* 184 Ga. App. 50, 52-53 (1), (2) (360 SE2d 624) (1987), aff'd, *Cooper v. Swofford,* 258 Ga. 143 (368 SE2d

518) (1988), and *Roberts v. Grigsby*, supra at 379-383 (Deen, P. J., concurring specially), which deal with the exercise of discretion, are inapplicable to this case. *Swofford v. Cooper*, supra, did not deal with a medical diagnosis or treatment, but with a decision to allow a psychiatric leave as part of therapy. Likewise, in *Roberts v. Grigsby*, supra, the chief of psychology made the decision to allow a psychiatric patient to be released.

The case against Dr. Chase is supported by an expert opinion that he deviated from the standard of care in failing to go to the jail after hearing the clinical signs from the nurse at 11:00 p.m. on May 23, 1992. He failed to examine, treat, or transfer Howard to the hospital. Therefore, there existed a material issue of fact for jury determination. Thus, this was a simple medical malpractice action for failure to examine, treat, or transfer. The trial court erred in granting summary judgment to Dr. Chase.

5. Plaintiffs contend that the trial court abused its discretion in denying their renewed motion for sanctions.

Plaintiffs sought to strike Sheriff Hodge's answer for wilful failure to comply with a discovery order. The trial court, in the exercise of its sound discretion, on plaintiffs' renewed motion for sanctions denied the ultimate sanction of striking the defensive pleadings and entering a default judgment against Hodge.

Dismissal of the answer and entry of a default judgment against a defendant who is in wilful, in bad faith, or in conscious disregard of an order compelling discovery are an appropriate sanction. *Didio v. Chess*, 218 Ga. App. 550, 551 (462 SE2d 450) (1995); *Smith v. Nat. Bank of Ga.*, 182 Ga. App. 55, 58 (354 SE2d 678) (1987). Neither the movant nor the trial court need find actual wilfulness, but only a conscious or intentional act in disregarding the duty to make discovery is necessary for imposing the sanction of default. *Resource Network Intl. v. Ritz-Carlton Hotel Co.*, 232 Ga. App. 242 (1) (501 SE2d 573) (1998); *Potter v. American Medcare Corp.*, 225 Ga. App. 343, 346 (484 SE2d 43) (1997); *Bells Ferry Landing, Ltd. v. Wirtz*, 188 Ga. App. 344, 345 (373 SE2d 50) (1988); *Sta-Power Indus. v. Avant*, 134 Ga. App. 952, 956-957 (2) (216 SE2d 897) (1975).

However, "[t]rial judges have broad discretion in controlling discovery, including imposition of sanctions, and appellate courts will not reverse a trial court's decision on such matters unless there has been a clear abuse of discretion." (Citations and punctuation omitted.) *West v. Equifax Credit Information Svcs.*, 230 Ga. App. 41, 42 (1) (495 SE2d 300) (1997). The appellate courts refuse to interfere with a trial court's exercise of its broad discretion, in the absence of abuse under the discovery provisions of the Civil Practice Act. *Gen. Motors Corp. v. Conkle*, 226 Ga. App. 34, 38 (1) (486 SE2d 180) (1997). The trial court should attempt to compel compliance with its orders

through the imposition of sanctions less than dismissal. The drastic sanctions of dismissal and default are imposed only in the most flagrant cases — where the failure is wilful, in bad faith, or in conscious disregard of an order. However, a very broad discretion is granted judges in applying sanctions to assure compliance with court orders. *Joel v. Duet Holdings*, 181 Ga. App. 705, 707 (353 SE2d 548) (1987); see also *Gen. Motors Corp. v. Conkle*, supra at 44; *Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 214-215 (3) (480 SE2d 604) (1997); *Hernandez v. State of Ga.*, 200 Ga. App. 368, 369 (408 SE2d 160) (1991).

However, the failure of the trial court to impose any sanctions at all when discovery abuse has been flagrant constitutes an abuse of discretion. *Vlasz v. Schweikhardt*, 178 Ga. App. 512, 516-517 (2) (343 SE2d 749) (1986); *Hohlstein v. White*, 117 Ga. App. 207 (1) (160 SE2d 232) (1968). Where no sanction has been imposed in a flagrant case and there was no evidence of a legitimate excuse before the trial court, this Court will "remand for reconsideration and the imposition of such sanctions as the trial court deems appropriate." *Vlasz v. Schweikhardt*, supra at 517. Even so, it is for the trial court, from all the facts and circumstances, to decide what sanction is appropriate. Therefore, the trial court in this case did not err in denying the imposition of the ultimate sanction of default when it previously imposed other sanctions.

*Judgment affirmed in part and reversed in part and remanded with direction. Pope, P. J., Barnes and Ellington, JJ., concur in judgment only. Johnson, C. J., Blackburn, P. J., and Smith, J., concur in judgment only in part and dissent in part.*

SMITH, Judge, concurring in judgment only in part and dissenting in part.

I concur in the result reached in Divisions 1, 2 (a), 3, 4, and 5 of the majority, but I do not agree with all that is said in those divisions. Because I believe that they contain much that is not necessary to the analysis, I cannot concur fully and must concur in the judgment only as to those divisions.

I must respectfully dissent, however, to Division 2 (b) of the opinion. The majority opinion declares, with respect to Sheriff Hodge, that "the requirements of supervision, including of adequate training and enforcement of all policies, practices, and protocol, are ministerial in nature." But neither *Gilbert v. Richardson*, 264 Ga. 744 (452 SE2d 476) (1994), nor *Seay v. Cleveland*, 270 Ga. 64 (508 SE2d 159) (1998), supports that broad and far-reaching proposition.[2]

---

[2] In *Seay*, the Supreme Court of Georgia merely reiterated that a sheriff may be sued in his individual capacity only to the extent he is not protected by official or qualified immu-

As the majority correctly observes,

"[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." [Cit.]

*Joyce v. Van Arsdale*, 196 Ga. App. 95, 96 (395 SE2d 275) (1990). Supervision of a law enforcement agency is generally a discretionary rather than ministerial function. *Lowe v. Jones County*, 231 Ga. App. 372, 373 (3) (499 SE2d 348) (1998) (" 'The operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function of the municipality as opposed to a ministerial, proprietary, or administratively routine function.' "). The majority has not demonstrated the basis for its conclusion that Sheriff Hodge's acts were ministerial in nature.

The majority also has failed to set forth any basis for holding that the actions of the licensed practical nurses employed at the jail were ministerial rather than discretionary. *Cantrell v. Thurman*, 231 Ga. App. 510, 514 (4) (499 SE2d 416) (1998), written by the author of the majority, also declares that the general obligation to provide medical care to prisoners is a ministerial act by the sheriff, but the authorities cited therein do not support that assertion. The writer of the majority also proposed this view of ministerial functions in a dissent to *Coffey v. Brooks County*, 231 Ga. App. 886, 895 (500 SE2d 341) (1998), rev'd on other grounds, *Rowe v. Coffey*, 270 Ga. 715 (515 SE2d 375) (1999).

The law as currently established by this court is quite different. In *Schmidt v. Adams*, 211 Ga. App. 156, 157 (438 SE2d 659) (1993) (full concurrence on issue of discretionary function), we held that the actions of a physician's assistant employed by a jail in failing properly to diagnose a condition and failing to order a timely transfer to a hospital were "based on his examination of the facts, his experience, and the exercise of his best judgment," and therefore were discretionary. The declaration of the existence of a "protocol" does not create a ministerial duty. The medical field has long published diagnostic and procedural manuals that establish criteria and make recommenda-

---

nity. Id. at 65-66, n. 1. *Gilbert* in fact concluded that the actions of the police officer in that case were discretionary rather than ministerial and affirmed the grant of summary judgment to the officer under the doctrine of official immunity. *Gilbert*, supra at 752-753 (6).

tions for the diagnosis and treatment of disease. The mere publication of such standards, however, does not remove from the practice of medicine or nursing the requirement that, as professionals, nurses examine the facts and exercise judgment, as in *Schmidt*.

In the recent decision of *Edwards v. Dept. of Children &c. Svcs.*, 236 Ga. App. 696 (512 SE2d 339) (1999), the parents of a deceased inmate alleged that workers and nurses at a youth development center had an absolute, nondiscretionary duty to summon medical aid for their daughter and failed to do so within a reasonable time. We concluded, however, that the "type of care and support and what and how much medical treatment to provide are decisions that must be left to the discretion of the employees who work with the inmates. [Cits.]" Id. at 700. Moreover, *Edwards* itself relies upon *Cantrell*, supra, to hold that while the county had a duty to provide medical care and treatment, "what medical care to provide is discretionary and therefore is subject to immunity. [Cit.]" *Edwards*, supra at 699.

We note that the Supreme Court of Georgia has granted certiorari in *Edwards* specifically to consider whether this court "improperly expanded the definition of 'discretionary function' found in OCGA § 50-21-22," part of the Georgia Tort Claims Act, in light of the Supreme Court's decision in *Dept. of Transp. v. Brown*, 267 Ga. 6 (471 SE2d 849) (1996), involving the distinction between design decisions and policy decisions in opening a highway intersection to traffic. But even if the scope of the discretionary function may be altered by the Supreme Court in the near future, it is nevertheless incumbent upon the majority at this time to articulate the reasons for its determination that the decisions made here were ministerial and not discretionary. Moreover, it appears that this result will require that we overrule *Lowe* and *Schmidt* and the decisions upon which they rely, because *Cantrell* is wholly inconsistent with the existing law in Georgia governing ministerial and discretionary acts.

For these reasons, I must respectfully dissent from Division 2 (b) of the majority opinion.

I am authorized to state that Chief Judge Johnson and Presiding Judge Blackburn join in this opinion.

DECIDED JULY 15, 1999 —
RECONSIDERATIONS DENIED JULY 29, 1999

*Burkey & Burkey, Frederick D. Burkey*, for appellants.

*Page, Scrantom, Sprouse, Tucker & Ford, W. G. Scrantom, Jr., James C. Clark, Jr., Eugene H. Polleys, Jr.*, for appellees (case no. A99A0680).

*Hatcher, Stubbs, Land, Hollis & Rothschild, Robert C. Martin,*