### A09A2368, A09A2369. ALTA REFRIGERATION, INC. v. AMERICOLD LOGISTICS, LLC; and vice versa.
#### (688 SE2d 658)

BLACKBURN, Presiding Judge.

This case arises out of an explosion and fire at a cold storage warehouse facility owned and operated by AmeriCold Logistics, LLC ("AmeriCold"). The explosion and fire, in turn, resulted from an accident that occurred as two employees of Alta Refrigeration, Inc. ("Alta"), assisted by an AmeriCold employee, attempted to reinstall a compressor engine in one of the engine rooms at the warehouse. The accident caused damages in excess of $17 million, and Ameri-Cold subsequently initiated the current litigation against Alta, asserting claims for breach of contract and negligence.

In Case No. A09A2368, Alta appeals from two separate orders of the trial court. In the first of these orders, the trial court granted summary judgment in favor of AmeriCold on the issue of liability, finding that under the borrowed servant doctrine, Alta was liable for any negligence of the AmeriCold employee involved in the accident. That order also denied Alta's cross-motion for summary judgment, which sought a judgment that the AmeriCold employee involved in the accident was not a borrowed servant of Alta. The second order denied Alta's motion to add AmeriCold's insurers as party-plaintiffs.

In Case No. A09A2369, AmeriCold cross-appeals from the trial court's order granting Alta's motion to compel production of an accident report, written following an investigation by AmeriCold personnel. AmeriCold argues that this report was prepared in anticipation of litigation and therefore constitutes privileged work-product.

Finding that there was no evidence to support the trial court's legal conclusion that the AmeriCold employee participating in the installation did so as a borrowed servant of Alta, we reverse the trial court's order granting summary judgment to AmeriCold on the issue of liability. We further find that, in light of this evidence, Alta is entitled to judgment as a matter of law holding that the AmeriCold employee was not acting as a borrowed servant of Alta at the time of the accident. We affirm, however, the trial court's order denying Alta's motion to add AmeriCold's insurers to the lawsuit as party-plaintiffs, finding that the cause of action belongs to AmeriCold. We also affirm the trial court's order granting Alta's motion to compel

discovery, because the trial court correctly concluded that the investigative report at issue was not entitled to work-product protection.

> On appeal from a grant of summary judgment, we conduct a de novo review of the evidence to determine if there exists a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, entitle the movant to judgment as a matter of law.

(Punctuation omitted.) *Bone v. The Children's Place.*[1]

So viewed, the record shows that the warehouse facility at issue used an ammonia refrigeration system to maintain the temperature necessary for cold storage of food products. Although AmeriCold had in-house personnel that performed routine maintenance and repairs on this system, it hired outside contractors to perform major repairs, replacements, and installations. Sometime before August 3, 2004, AmeriCold hired Alta to remove, rebuild, and reinstall one of AmeriCold's existing ammonia compressor engines. On August 3, 2004, two Alta service technicians, Guy Ploeckelman and Greg Ireland, traveled to the warehouse separately to reinstall the remanufactured compressor engine. Upon arriving at the warehouse, Ireland went in and found John Ausmus, who was the lead technician in AmeriCold's refrigeration department and the assistant to the chief engineer at the warehouse. Ausmus told Ireland that Ausmus "would be working with [the Alta technicians] and that [Ausmus] would get a forklift after his break." Ireland then proceeded to the engine room and began preparing the compressor body for the reinstallation of the engine.

Sometime thereafter, Ploeckelman arrived at the warehouse with the compressor engine, having transported it there on a flat bed trailer. Ploeckelman then found Ausmus, who had previously assisted Ploeckelman and Alta personnel with the removal and reinstallation of compressor engines at the warehouse. According to Ausmus, because Alta did not have an A-frame device available to use in moving the engine, the three men "brain stormed" about how to get the engine into the building, and came to the consensus that they "needed a forklift." Ausmus, therefore, went and obtained an AmeriCold forklift, and the Alta technicians loaded the compressor engine onto the same, using straps to hang the engine from the tines of the forklift.

When the compressor engine was loaded, Ausmus drove the forklift into the warehouse, with Ploeckelman and Ireland walking

---

[1] *Bone v. The Children's Place*, 297 Ga. App. 367 (677 SE2d 404) (2009).

along next to him to make sure he had the necessary clearance. After getting the compressor engine into the building, Ausmus testified that the three men discussed the best way to get the engine into the engine room and lifted up onto the compressor body. They again decided on a forklift and Ausmus obtained at least two more forklifts, which they attempted to use to move the compressor engine into the engine room and to lift it up for placement on the compressor body. When each of these forklifts proved to be too big to fit through the doorway of the engine room, Ploeckelman called the Alta technician who had removed the engine and was told that Alta and AmeriCold had used a forklift that did not have a pallet guard on it.[2] Ausmus then went and retrieved a small forklift, which he referred to as a dock truck. To move the compressor engine with this forklift, however, required the addition of fork extensions. Ausmus, therefore, obtained fork extensions belonging to AmeriCold and mounted the same on the forklift. Before they loaded it onto the forklift, Ireland looked up the weight of the compressor engine, which was approximately 3,000 pounds, told Ausmus the weight, and asked if the forklift could handle the load. Ausmus assured them that all of the forklifts at the warehouse could carry loads of up to 4,500 pounds. As a precaution, however, after they attached the compressor engine to this forklift, the men performed a "test lift" in the hallway outside the engine room. When the forklift lifted the compressor engine approximately six to seven feet off the ground without incident, the men decided that it was safe to proceed.

Ireland and Ploeckelman then went into the engine room and positioned themselves to guide the compressor engine into place, and Ausmus drove the forklift into the engine room. As he did so, however, the forklift began to tilt forward and the compressor engine slipped and struck a pipe containing pressurized ammonia gas. The pipe ruptured and, because of the escaping gas, the men evacuated the room, Ausmus alerted his supervisor, and AmeriCold evacuated the facility ahead of the ensuing explosion and fire. It was eventually determined that Ausmus had merely assumed that the dock truck was rated for lifting up to 4,500 pounds; it was, in fact, rated only to lift up to 2,900 pounds.

Following the accident, AmeriCold officials in Atlanta asked Bob Keithley, an AmeriCold regional facility services director stationed in Indianapolis, to come to Atlanta and conduct an investigation of the accident. Keithley made a written report detailing his investigation (the "Keithley Report"), and during discovery Alta requested a copy

---

[2] A pallet guard is a safety guard on the forks, designed to prevent any items that might fall off a pallet being moved from hitting the forklift operator.

of the same. AmeriCold refused to produce the Keithley Report, asserting that it was protected by the work-product privilege. Alta then filed a motion to compel, and the trial court granted that motion, finding that the Keithley Report "was prepared according to AmeriCold's standard operating procedure [and] was not prepared in anticipation of litigation [or] by or at the direction of AmeriCold's counsel." The day after granting the motion to compel, however, the trial court granted AmeriCold's motion for summary judgment on the issue of liability. Specifically, the trial court found that no part of the accident could be attributed to AmeriCold because, when he assisted in the attempted reinstallation of the compressor engine, Ausmus was acting as a borrowed servant of Alta, rather than as an employee of AmeriCold.

Three different insurers, Travelers Indemnity Company ("Travelers"), Lexington Insurance Company ("Lexington"), and The Hartford Insurance Company ("Hartford"), indemnified AmeriCold for the losses it sustained as a result of the accident, with one insurance adjuster handling all of the claims paid by each insurer. Lexington issued a series of eight checks, totaling $4,294,504.52, to AmeriCold between August 16, 2004 and April 6, 2006; Hartford issued a series of eight checks, totaling $4,294,504.52, to AmeriCold between August 13, 2004 and November 9, 2007; and Travelers issued a series of ten checks, totaling $8,589,009.04, to AmeriCold between August 13, 2004 and December 7, 2007. These periodic payments were made as reconstruction of the warehouse progressed, as customer claims were settled, and as lost profits were determined.

On January 29, 2008, AmeriCold executed three separate loan receipts, one in favor of each of the insurers, for the amount that each insurer had paid to indemnify AmeriCold for the losses sustained in the accident. Each of those loan receipts stated that the insurance payments received by AmeriCold represented "a loan, without interest, repayable only in the event and to the extent of any net recovery [AmeriCold] may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss or damage to the property . . . ." The loan receipts further provided, in relevant part:

> In further consideration of said loan, [AmeriCold] . . . hereby appoint(s) the managers and/or agents of the said [Insurance] Company and their successors with irrevocable power to collect any such claim or claims, and to begin, prosecute, compromise, or withdraw in the name of AmeriCold Logistics, LLC, any and all legal proceedings that the said [Insurance] Company may deem necessary to enforce such claim or claims, and to execute in the name of

[AmeriCold] any documents that may be necessary to carry the same into effect for purposes of this agreement. Any legal proceedings are to be under the exclusive direction and control of said [Insurance] Company to the extent of its interest.

After learning of the loan receipts, which were executed approximately six months after the initiation of this lawsuit, Alta moved to add the insurers as party-plaintiffs. In support of this motion, Alta argued that because the insurers did not obtain loan receipts until they had finished paying the claims made under their respective policies, it was the insurers, rather than AmeriCold, who were the real parties in interest in this litigation. In response, AmeriCold submitted the affidavit of the insurance adjuster who handled these claims on behalf of all three insurers, in which he averred that "[a]lthough the last checks regarding this claim were cut by the carriers in 2007 . . . these checks were not tendered to AmeriCold . . . until the loan receipts were executed." Although this affidavit contained at least two significant misstatements of fact,[3] the trial court nevertheless apparently relied on the same in summarily denying Alta's motion.

In Case No. A09A2368, Alta seeks a reversal of both the trial court's order granting summary judgment in favor of AmeriCold on the issue of liability and denying its own cross-motion for summary judgment on the issue of whether Ausmus was acting as a borrowed servant of Alta, and the trial court's order denying its motion to add the insurers as party-plaintiffs. In Case No. A09A2369, AmeriCold cross-appeals from the trial court's order granting Alta's motion to compel the production of the Keithley Report.

### Case No. A09A2368

Before addressing the merits of this appeal, we first address AmeriCold's motion to strike those portions of Alta's brief that cite to Ireland's deposition testimony, to OSHA regulations, and to ANSI

---

[3] For example, the last check from Lexington to AmeriCold was dated April *2006*, not 2007, and thus would presumably have been invalid by January 2008. Moreover, the insurance adjuster further averred that he "was physically present for the execution of [each] loan receipt . . . [and] [a]t that time, the final checks issued by the carriers . . . were exchanged contemporaneously for the executed loan receipt." The record, however, contains a cancelled copy of the last check from Lexington to AmeriCold, which shows that the same was cashed in June 2006, approximately 19 months *before* the execution of the loan receipt to Lexington. Although ultimately not relevant to our decision, we point out these discrepancies because we have some concern over the fact that AmeriCold's counsel procured and filed a sworn affidavit containing such obvious misstatements.

standards.[4] AmeriCold argues that these portions of Alta's brief should be stricken because: (i) the original of Ireland's deposition was not filed with the trial court until after entry of the order granting AmeriCold summary judgment on the issue of liability; and (ii) Alta failed to cite either the OSHA regulations or the ANSI standards to support its arguments against AmeriCold's summary judgment motion in the trial court. We note, however, that excerpts of Ireland's deposition were attached to the brief Alta filed in the trial court in opposition to AmeriCold's summary judgment motion, and therefore could be properly considered by the trial court. See *All Fleet Refinishing v. West Ga. Nat. Bank*.[5] Additionally, in reaching our decision, we do not find it necessary to rely on those portions of Ireland's deposition which were filed after the summary judgment order, nor do we rely on the OSHA regulations or ANSI standards cited in Alta's appellate brief. Accordingly, AmeriCold's motion to strike portions of that brief is denied.

We now turn to the merits of this appeal.

1. The first issue we must determine is whether the undisputed facts show that Ausmus was a borrowed servant of Alta. The "borrowed servant" rule represents an exception to the doctrine of respondeat superior. Under this rule, "[i]f a master lends his servants to another, then the master is not responsible for any negligence of the servant committed within the scope of his employment by the other." (Citation and punctuation omitted.) *Odum v. Superior Rigging & Erecting Co.*[6] The party seeking either to establish or to avoid liability based upon the borrowed servant doctrine must demonstrate that: "(1) [t]he borrowing employer [had] complete control and direction over the employee for the occasion; (2) the lending employer [had] no such control and (3) the borrowing employer [had] the exclusive right to discharge the employee." (Citation omitted.) *Staffing Resources v. Nash*.[7] Here, we find that AmeriCold failed to establish any of these three factors.

With respect to the first two factors, we note that "[t]he right to control means the right to tell an employee how he shall go about doing the job in every detail, including what tools he shall use and

[4] ANSI standards are safety standards promulgated by the American National Standards Institute and, "as privately established guidelines, are admissible as illustrative of negligence." (Punctuation omitted.) *Davis v. GBR Properties*, 233 Ga. App. 550, 551 (1) (504 SE2d 204) (1998).

[5] *All Fleet Refinishing v. West Ga. Nat. Bank*, 280 Ga. App. 676, 678 (1), n. 8 (634 SE2d 802) (2006).

[6] *Odum v. Superior Rigging & Erecting Co.*, 291 Ga. App. 746, 748 (662 SE2d 832) (2008).

[7] *Staffing Resources v. Nash*, 218 Ga. App. 525, 526 (1) (462 SE2d 401) (1995).

what procedures he shall follow." (Punctuation omitted.) *Kidd v. Dentsply Intl.*[8] Moreover,

> [t]here is a distinction between the act of merely following directions while giving assistance to another's servant and the status of being within the "complete control" of another's servant. The former connotes cooperation with another's servant, not the subordination which is implicit in the notion of "complete control."

(Citation and punctuation omitted.) *Food Giant v. Davison.*[9] Here, there is no evidence to support a conclusion that Ausmus was under the "complete control" of the Alta technicians; rather, that evidence, at best, shows that AmeriCold tasked Ausmus with providing the Alta technicians any assistance they might require to complete the reinstallation.

Ausmus testified that he had been instructed by his boss at AmeriCold to assist with the compressor engine reinstallation, and to follow the Alta technicians' instructions with respect to that reinstallation. As part of that assignment, Ausmus understood he was to get the Alta technicians "anything we had at AmeriCold that would help them do their job." Ausmus further testified that the decision to use a forklift, first to get the compressor engine into the warehouse and then to get it into the engine room and lifted onto the compressor base, was a joint decision made by Ausmus and the Alta technicians. Ausmus explained that the three men "brain stormed" and concluded that they needed a forklift to get the engine into the building.[10]

Once the compressor engine was in the warehouse, Ausmus explained that it was again all three men "talking together [that] came up with" the decision to use a forklift to move the engine into the engine room and lift it onto the compressor base. When the first two attempts to get the compressor engine into the engine room failed because the forklifts were too big, Ausmus testified that the three men "sat there and talked about what *we* were going to do next." He further explained that "the only other option *we* could come up with was to use the dock truck, since it's shorter." Additionally, Ausmus testified that, as he was driving the forklift with the attached compressor engine into the machine room, the job

---

[8] *Kidd v. Dentsply Intl.*, 278 Ga. App. 346, 348 (1) (629 SE2d 58) (2006).

[9] *Food Giant v. Davison*, 184 Ga. App. 742, 744 (362 SE2d 447) (1987).

[10] Similarly, Ploeckelman testified that the decision whether to use a forklift or some other method of lifting the compressor engine during the removal or reinstallation of the same was generally made "between . . . the lead [Alta] technician and . . . [the customer's] facility maintenance rep."

YALE LAW LIBRARY

of the Alta technicians was to assist him, by acting as his ground guides, making sure that he had the appropriate clearance, and stabilizing the load. Although the Alta technicians were clearly assisting Ausmus, there is no evidence indicating that they ever attempted to instruct or supervise Ausmus on how to operate the forklift. This undisputed testimony demonstrates that, rather than working for the Alta technicians, Ausmus was working with them — i.e., that the men were engaged in a collaborative effort.

Further showing that the Alta technicians were not exercising "complete control" over Ausmus is the fact that the selection and operation of the necessary forklifts was left to Ausmus's sole discretion. Ausmus testified that he alone selected, retrieved, and operated each of the forklifts used on the project, explaining that he had to "commandeer" a certain model that was in use elsewhere at AmeriCold. The only input the Alta technicians had with respect to the selection of the forklifts was to tell Ausmus the weight of the compressor engine, and to ask him if the forklift could bear that weight. Ausmus testified that he was aware that the Alta technicians were relying on him to select and use forklifts that could handle the weight of the compressor engine. Furthermore, it was Ausmus who determined that fork extensions were needed for the dock truck, who went and retrieved the fork extensions, and who attached the fork extensions.

Moreover, Ausmus acknowledged that it was standard Ameri-Cold policy, when forklifts were used to remove and reinstall compressor engines, that the forklift would be operated by an AmeriCold employee. This was because the only persons allowed to operate AmeriCold's forklifts were AmeriCold employees who had received the required in-house training on the use of that equipment. Alta personnel were aware of that policy, and therefore knew that if a compressor engine needed to be moved by forklift, that task would have to be handled by an AmeriCold employee. AmeriCold's policies regarding the people who could operate its forklifts also shows that such forklifts were to be operated pursuant to the instructions AmeriCold provided its employees, during the required in-house training.

As the foregoing shows, in performing the task at issue, Ausmus used equipment belonging to his employer. And it was Ausmus, rather than the Alta technicians, who determined what forklift to use and whether the forklift could lift the weight of the compressor engine. Moreover, the use of this equipment "was part of [Ausmus's] usual and regular business of his employment with [AmeriCold]," as was his assignment to assist the Alta technicians with the reinstallation of the compressor engine. *Kidd*, supra, 278 Ga. App. at 348 (1). There is no evidence showing that the Alta technicians exercised

control over Ausmus in his performance of these tasks, or that they even had the authority to exercise such complete control. At best, therefore, the evidence establishes that Ausmus "had been ordered by his supervisor to give assistance to" the Alta technicians and therefore he may have been "under the[ir] 'direction' . . . at the time of the incident." *Jones v. Tingue, Brown & Co.*[11] "The fact that [Ausmus] was under the direction of [Alta's] employees with regard to some aspects of the performance of the task of [reinstalling the compressor engine] did not make him [Alta's] borrowed servant." (Punctuation omitted.) *Food Giant*, supra, 184 Ga. App. at 744. See also *Jones*, supra, 171 Ga. App. at 598 (1) ("the borrowed servant doctrine contemplates that, in addition to direction, the special master will have 'control' over the servant to the exclusion of the general master") (punctuation omitted). Accordingly, AmeriCold failed to satisfy either of the first two prongs of the borrowed servant test.

AmeriCold also failed to establish the third prong of the borrowed servant test, because there is no evidence that Alta had the authority to discharge Ausmus from his assignment to assist them with the reinstallation. As Ausmus's above-cited testimony demonstrates, it was his boss who had assigned him to that task and, therefore, it was only his boss who had the authority to remove him from the same. In other words, while the Alta technicians may have had the ability to ask that someone other than Ausmus be assigned to help them, there is no evidence that they personally had the authority to relieve Ausmus of that responsibility. And, simply because the Alta technicians could have chosen to stop work altogether, rather than working with Ausmus, does not change the fact that they did not have the ability to discharge Ausmus.

Because no evidence supports a finding that Ausmus was a borrowed servant of Alta, we reverse the trial court's order granting summary judgment to AmeriCold on the issue of liability.

2. In light of the foregoing, we further find that Alta was entitled to judgment as a matter of law that Ausmus could not be the borrowed servant of Alta. Accordingly, we also reverse that part of the trial court's order denying Alta's cross-motion for summary judgment.

3. We now turn to Alta's claim that the trial court erred in denying its motion to add AmeriCold's insurers as party-plaintiffs, arguing that the insurers are the real parties in interest. "The determination of whether a party should be added to a lawsuit lies within the discretion of the trial court, and that determination will

---

[11] *Jones v. Tingue, Brown & Co.*, 171 Ga. App. 597, 598 (1) (320 SE2d 587) (1984).

not be disturbed on appeal absent a showing of abuse." (Punctuation omitted.) *Ellison v. Hill*.[12]

Here, the language of the loan receipts executed by AmeriCold in favor of each of its insurers, as well as the relevant law, require a finding that AmeriCold is the proper party-plaintiff in this action. Under Georgia law,

> the usual or ordinary form of loan receipt executed by an insured on payment of a loss to him by his insurer but occasioned by a third party tortfeasor, is valid, is not a subrogation agreement, and allows an action to proceed in the name of the insured against the tortfeasor, subject to control to the extent of its interest by the insurer, and further allows the insurer to recover to the extent of its payment out of any amount collected by the insured in such an action. The loan receipt does not amount to an assignment of the claim. . . .

(Citations and punctuation omitted.) *Hall v. Helms*.[13] "Thus, the loan receipt is a valid method of keeping the insurance company out of the litigation as a party. In such a case the insured is the proper plaintiff." *American Chain & Cable Co. v. Brunson*.[14]

Alta argues that this legal principle does not apply where an insurer fails to obtain a loan receipt until after it has paid the insured's claim; instead, Alta asserts that an insurer must obtain a loan receipt each time it makes a payment on a claim. Because AmeriCold's insurers failed to obtain such contemporaneous loan receipts, therefore, Alta argues that those insurers must prosecute the current action in their own name. However, none of the cases which Alta cites supports this proposition. See *United States Fidelity & Guaranty Co. v. J. I. Case Co.*;[15] *Bryant v. Atlanta Gas Light Co.*;[16] *General Ins. Co. of America v. Bowers*.[17] Rather, each of those cases merely holds that where an insurer fails to obtain a loan receipt *until some time after it obtains an assignment of the insured's claim*, it must prosecute any subsequent lawsuit in its own name. In other words, an insurer may not attempt to void an earlier assignment of the insured's claim by having that insured later sign a loan receipt.

---

[12] *Ellison v. Hill*, 288 Ga. App. 415, 418 (2) (654 SE2d 158) (2007).

[13] *Hall v. Helms*, 150 Ga. App. 257, 257 (1) (257 SE2d 349) (1979).

[14] *American Chain & Cable Co. v. Brunson*, 157 Ga. App. 833, 834 (278 SE2d 719) (1981), disapproved on other grounds, *Weaver v. Ross*, 192 Ga. App. 568 (386 SE2d 43) (1989).

[15] *United States Fidelity & Guaranty Co. v. J. I. Case Co.*, 209 Ga. App. 61 (432 SE2d 654) (1993).

[16] *Bryant v. Atlanta Gas Light Co.*, 149 Ga. App. 126 (253 SE2d 807) (1979).

[17] *General Ins. Co. of America v. Bowers*, 139 Ga. App. 416 (228 SE2d 348) (1976).

See *United States Fidelity & Guaranty Co.*, supra, 209 Ga. App. at 63 (1) ("[t]he right of action, if any existed, would have been in the (hands of the) insurer under the [assignment and] subrogation agreement [and therefore] [t]he insurer was the only possible party plaintiff . . .") (punctuation omitted); *Bryant*, supra, 149 Ga. App. at 127 (1) (where the insured had assigned her claim to the insurance company, "the so-called loan receipt was not a novation of the assignment and subrogation agreement, and that the [insured] had no right to maintain the action") (punctuation omitted); *General Ins. Co.*, supra, 139 Ga. App. at 419 ("even though [the insurer] subsequently procured a loan receipt in addition to the subrogation agreement on the proof of loss form, it was a nullity since [the insured] had already divested itself of its cause of action[, and] [t]he trial court correctly ruled that [the insurer] was the real party in interest").

Alta has pointed to no evidence showing that AmeriCold assigned its cause of action against Alta to its insurers at any time, including any time prior to its execution of the loan receipts. Specifically, Alta has identified no documents, such as proof of loss forms or subrogation agreements, under which AmeriCold assigned its right to pursue a claim against Alta. Accordingly, the trial court correctly found that AmeriCold is the proper party-plaintiff in this action, and we affirm the order denying Alta's motion to add the insurers as party-plaintiffs.

### Case No. A09A2369

4. The question posed by this appeal is whether the trial court erred in finding that the work-product doctrine did not apply to protect the Keithley Report from discovery. The work-product doctrine shields from discovery otherwise discoverable materials that were "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) . . . ." OCGA § 9-11-26 (b) (3). "[T]he party wishing to claim the protection of [the work-product doctrine] has the burden of showing the document or other item was[, in fact,] prepared in anticipation of litigation." *GMC v. Conkle*.[18] "Application of the work[-]product doctrine . . . falls within the trial court's discretion," *Fulton DeKalb Hosp. Auth. v. Miller & Billips*,[19] and we "will not reverse a trial court's decision on [the applicability of that doctrine]

---

[18] *GMC v. Conkle*, 226 Ga. App. 34, 46 (2) (486 SE2d 180) (1997).
[19] *Fulton DeKalb Hosp. Auth. v. Miller & Billips*, 293 Ga. App. 601, 602 (1) (667 SE2d 455) (2008).

absent a clear abuse of [such] discretion." (Punctuation omitted.) *Ford Motor Co. v. Gibson.*[20]

In determining whether materials were prepared in anticipation of litigation, our cases have focused on whether such materials can reasonably be viewed as having been prepared in response to the actual prospect of litigation, rather than having been prepared in the regular course of business. See *Fulton DeKalb Hosp. Auth.*, supra, 293 Ga. App. at 603-604 (2) (where investigation resulted from anonymous complaints to personnel department, as opposed "to any claim or threat of litigation," investigatory material did not fall within work-product doctrine, even though lawyers participated in the investigation); *Atlantic Coast Line R. Co. v. Gause*[21] (investigatory material generated during routine investigation conducted following an accident did not fall within work-product doctrine, even though investigation was conducted under direct supervision of attorney). Compare *Dept. of Transp. v. Hardaway Co.*[22] (where "a written claim and demand for payment outside the terms of the contract was presented," investigative materials prepared in response to that claim were protected by work-product doctrine); *Lowe's of Ga. v. Webb*[23] (incident investigation could not be considered a routine investigation where, by the time it was undertaken, injured customer had already threatened store with a claim).

In granting Alta's motion to compel, the trial court found that the Keithley Report "was prepared according to AmeriCold's standard operating procedure," and "was not prepared in anticipation of litigation." The trial court based this finding on the fact that both AmeriCold's own safety manuals and relevant OSHA regulations "required AmeriCold to conduct an investigation after the release of ammonia into the workplace."

Urging us to reverse these findings, AmeriCold cites the affidavit testimony of its Atlanta executives, which averred that the Keithley Report and the underlying investigation were done in anticipation of litigation. Specifically, those affidavits asserted that immediately after the accident, AmeriCold officials in Atlanta became aware of potential OSHA violations and potential claims by AmeriCold customers whose property had been damaged or destroyed. Thus, those officials requested that Keithley conduct an "incident investiga-

---

[20] *Ford Motor Co. v. Gibson*, 283 Ga. 398, 401 (1) (659 SE2d 346) (2008).

[21] *Atlantic Coast Line R. Co. v. Gause*, 116 Ga. App. 216, 223-224 (1) (156 SE2d 476) (1967).

[22] *Dept. of Transp. v. Hardaway Co.*, 216 Ga. App. 262, 265 (2) (454 SE2d 167) (1995), rev'd on other grounds, *Johnson & Johnson v. Kaufman*, 226 Ga. App. 77, 82 (485 SE2d 525) (1997).

[23] *Lowe's of Ga. v. Webb*, 180 Ga. App. 755, 757 (350 SE2d 292) (1986).

tion," "in anticipation of the various types of litigation which did, in fact, come to fruition."

AmeriCold argues that because these affidavits represent "the only evidence of record explaining why this specific report was created and under what circumstances," the trial court could not disregard the same and was obligated to find that the Keithley Report was created in anticipation of litigation. This argument, however, fails to recognize that while the affidavits may have been the only testimonial evidence on this issue, they were not the only factual evidence regarding the same. The other evidence included copies of AmeriCold's own "Incident Investigation Policy," which outlined the procedures to be followed after a "catastrophic release of ammonia." That policy dictated that, following such an incident, the General Manager/Chief Engineer of the facility would select members of an "Incident Investigation Team," and stated that "[t]he exact membership of the Team will be dependent upon the severity and circumstances surrounding the incident." The Incident Investigation Team would be responsible for conducting an investigation to ascertain the facts surrounding the incident, to determine the cause of the incident, and to recommend corrective and preventative measures. The team would then make a written report of the foregoing, and attach the same to an "Incident Investigation Form."

Notably, the foregoing policy specifically stated that the Incident Investigation Team must be appointed within 48 hours of the incident, to comply with the relevant OSHA regulation. That regulation (29 CFR § 1910.119 (m)) applies to all incidents "which resulted in, or could reasonably have resulted in a catastrophic release of highly hazardous chemical in the workplace." 29 CFR § 1910.119 (m) (1). It requires that within 48 hours following the incident, the employer shall establish an incident investigation team and initiate an investigation. 29 CFR § 1910.119 (m) (2)-(3). The regulation further mandates that a "report shall be prepared at the conclusion of the investigation," sets forth the minimum contents of such a report, and requires the employer to retain the report for five years. 29 CFR § 1910.119 (m) (4), (7).

In light of this evidence, we cannot say that the trial court abused its discretion in concluding that the Keithley Report was prepared as part of AmeriCold's standard operating procedure — i.e., that the investigation which resulted in that report was a routine investigation, and was not prompted by an actual prospect of litigation. And, we note that despite this evidence, AmeriCold has failed to refute the trial court's conclusion by identifying some other investigation that was conducted in compliance with its policies or the applicable OSHA regulations. Rather, AmeriCold points only to the affidavits of its two officials — neither of whom was Keithley.

"The trial court[, however,] is the trier of fact in discovery disputes." *McKesson HBOC v. Adler*.[24] As such, it was free to find that, particularly when viewed in light of the other evidence, the affiants' assertions that the Keithley Report was prepared in anticipation of litigation were not credible. See *Amaechi v. Somsino*.[25] Accordingly, we affirm the trial court's order granting Alta's motion to compel production of the Keithley Report.

*Judgment affirmed in part and reversed in part in Case No. A09A02368; judgment affirmed in Case No. A09A2369. Adams and Doyle, JJ., concur.*

DECIDED DECEMBER 17, 2009.

*Mozley, Finlayson & Loggins, Wayne D. Taylor, Lawrence B. Domenico*, for appellant.

*Lacy & Snyder, William T. Lacy, Jr.*, for appellee.

[24] *McKesson HBOC v. Adler*, 254 Ga. App. 500, 504 (1) (562 SE2d 809) (2002).

[25] *Amaechi v. Somsino*, 259 Ga. App. 346, 347 (577 SE2d 48) (2003).